Donald W. RIEGLE, Jr., Member, U. S. Senate, Appellant,

v.

FEDERAL OPEN MARKET COMMITTEE, et al., Appellees.

No. 80–1061.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 15, 1981.

Decided June 24, 1981.

---

874

Grasty Crews, II, Washington, D. C., for appellant.

Lewis K. Wise, Atty., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., Charles F. C. Ruff, U. S. Atty., and Anthony Steinmeyer, Atty., Dept. of Justice, Washington, D. C., were on the brief for appellees.

Before ROBB and EDWARDS, Circuit Judges and PENN *, United States District Judge for the District of Columbia.

Opinion for the Court filed by Circuit Judge ROBB.

ROBB, Circuit Judge:

This case presents the question whether a United States Senator has standing to challenge the constitutionality of the procedures established by the Federal Reserve Act, 12 U.S.C. § 221 *et seq.* (1976) for the appointment of the five Reserve Bank members of the Federal Open Market Committee. A corollary question is whether, assuming the Senator has standing, this court should afford him relief. The complaint of the appellant, Senator Donald W. Riegle, Jr., of Michigan, was dismissed by the United States District Court for the District of Columbia on the ground that the Senator lacked standing to seek injunctive relief from the allegedly unconstitutional procedures authorized by the Act. *Riegle v. Federal Open Market Committee, et al.,* 84 F.R.D. 114, 116 (D.D.C.1979) (Gesell, J.). We affirm on a ground different from that relied upon below.

I.

The Federal Reserve System, which was created by Congress in 1913 as this nation's central bank, is comprised of public and private entities organized on a regional basis with federal supervisory authority.[1] The System includes a seven-member Board of Governors, the twelve regional Federal

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. *See Reuss v. Balles,* 189 U.S.App.D.C. 303, 584 F.2d 461, 462–65, *cert. denied,* 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978) for a description of the Federal Reserve System, open market operations, and the evolution and functions of the FOMC. *See also* T. Mayer, J. Duesenberry, & R. Aliber, Money, Banking, and the Economy (1981); "A Look Inside Paul Volcker's Fed," *N.Y. Times* (May 3, 1981), sec. 3, at 1, 8–9.

Reserve Banks, the FOMC, the Federal Advisory Council, and approximately 5,500 privately-owned member commercial banks. (Br. of FOMC at 4) The primary role of the System in the conduct of monetary policy is to facilitate the achievement of national economic goals through influence on the availability and cost of bank reserves, bank credit, and money. Three basic mechanisms employed by the System to implement monetary policy are open market operations, regulation of member bank borrowing from the Federal Reserve Banks, and establishment of member bank reserve requirements. The most flexible and potentially significant of these tools is open market transactions. (Br. of FOMC at 6)

Open market trading, which consists of the purchase and sale of government and other securities in the financial markets by the Reserve Banks, is exclusively directed and regulated by the FOMC. 12 U.S.C. § 263(b) (1976). The FOMC, like the System as a whole, is constituted to reflect both public and private interests. Since 1935 the FOMC has been composed of the seven members of the Board of Governors of the Federal Reserve System, 12 U.S.C. § 241 (1976), who are appointed by the President with the advice and consent of the Senate, and five representatives of the Federal Reserve Banks, who are elected annually by the boards of directors of the Banks. 12 U.S.C. § 263(a) (1976). Since 1942 Congress has required that the five Reserve Bank members of the FOMC be either presidents or first vice presidents of the Reserve Banks. 12 U.S.C. § 263(a). The Reserve Banks are private corporations whose stock is owned by the member commercial banks within their districts. 12 U.S.C. § 321 (1976). These member commercial banks elect six of the nine members of the board of directors of each Reserve Bank, and the Board of Governors of the Federal Reserve System selects the remaining three. 12 U.S.C. §§ 302, 304 (1976). The presidents and first vice presidents of the Reserve Banks, although selected by the respective boards of directors, are subject to the approval, suspension, and removal authority of the Board of Governors. 12 U.S.C. §§ 341, 248 (1976). In short, the FOMC consists of seven members who hold their offices by virtue of presidential appointments confirmed by the Senate, and five members who are elected by the boards of directors of the Banks and who hold their offices subject to the approval of the Board of Governors. 12 U.S.C. § 263(a).

The securities transactions directed by the FOMC have a significant effect on the financial markets. In 1974, for example, the FOMC alone was responsible for approximately $19.4 billion in outright transactions in U.S. Government Securities. (Br. of Riegle at 5) These transactions potentially affect the value of the dollar, foreign exchange rates, interest rates, investment, and employment. *Id.* Approximately every 45 days, the FOMC formulates its monetary policy objectives for the immediate future by setting targets for growth rates in the money supply and the range of variance in the Federal Funds rate (the member banks' rate for overnight loans of excess reserves to other banks). The FOMC then issues a domestic policy directive to the Federal Reserve Bank of New York for the management of the System Open Market Account, which is a central entity representing the open market transaction interests of the twelve Reserve Banks. The manager of the Account, who maintains daily contact with Federal Reserve staff members in Washington, engages in financial transactions designed to achieve the monetary conditions sought by the FOMC. Reserve Banks are prohibited under the Act from engaging in any open market transactions except those directed by the FOMC through the Account. 12 U.S.C. § 263(b).

Considering the substantial economic power wielded by the FOMC, it is not surprising that controversy over the balance between public and private control of the Committee has existed since its creation. As originally constituted, the FOMC was privately dominated, consisting solely of representatives of the twelve Reserve Banks. Banking Act of 1933, 48 Stat. 162. This arrangement was unsatisfactory to those who favored greater governmental

control over disposition of Reserve Bank funds. During debates on the Senate floor preceding passage of the Banking Act of 1935, 49 Stat. 684, Chairman Carter Glass of the Senate Banking Committee (a supporter of Reserve Bank control of the FOMC) explained the legislative compromise between public (Board of Governors) and private (Reserve Bank) interests which produced the present procedure for constituting the FOMC:

> [We are] amazed to have it proposed that the Federal Reserve Board alone should constitute the open-market committee of the system.... The Government of the United States has never contributed a dollar to one of the Reserve Banks; yet it is proposed to have the Federal Reserve Board, having not a dollar of pecuniary interest in the Reserve funds or the deposits of the Federal Reserve banks or of the member banks ... to make such disposition of the reserve funds of the country, and in large measure the deposits of the member banks of the country, as they may please .... [I]n order to reconcile bitter differences there was yielding, and we have now proposed an open-market committee composed of all 7 members of the Federal Reserve Board and 5 representatives of the regional reserve banks.

79 Cong.Rec. 11778 (1935).

Despite the passage of the compromise represented by the Banking Act of 1935, the debate over public and private control of the FOMC has continued during the past 48 years. The late Congressman Wright Patman, Chairman of the House Banking Committee, asserted in 1938 that the Reserve Bank members of the FOMC did not represent the "people's interest."[2] Mr. Patman's successor, Congressman Henry S. Reuss, has made several unsuccessful attempts, both in Congress by amendment of

12 U.S.C. § 263(a) and in the federal courts, to require that the five Reserve Bank members of the FOMC be appointed with the advice and consent of the Senate pursuant to the Appointments Clause. United States Constitution, Art. II, sec. 2, cl. 2. Based on his belief that the work of the FOMC "is essentially a governmental function, and should not be exercised by private people,"[3] Mr. Reuss in 1976 introduced the "Federal Reserve Reform Act," H.R. 12934, 94th Cong., 2d Sess. (1976), which in part would have required that the five Reserve Bank seats on the FOMC be limited to Bank presidents appointed by the President with the advice and consent of the Senate. The House Banking Committee defeated this provision on April 30, 1976. (Br. of FOMC at 21) Mr. Reuss then brought an action in federal court seeking, in part, to have 12 U.S.C. § 263(a) declared unconstitutional. The District Court dismissed the action on the ground that the Congressman lacked standing to sue either in his capacity as a congressman or as a private bondholder. *Reuss v. Balles*, 73 F.R.D. 90 (D.D.C.1976) (Parker, J.), *aff'd*, 189 U.S.App.D.C. 303, 584 F.2d 461, *cert. denied*, 439 U.S. 997, 99 S.Ct. 598, 58 L.Ed.2d 670 (1978). On April 1, 1980 Congressman Reuss introduced another bill, H.R. 7001, which would amend 12 U.S.C. § 263(a) in the manner sought by Senator Riegle in this case: a prohibition on voting by the five Reserve Bank members of the FOMC. This legislation was not enacted.[4] (Br. of FOMC at 21–22)

Senator Riegle instituted the present suit on July 2, 1979 (prior to the introduction of H.R. 7001 by Congressman Reuss) in the United States District Court for the District of Columbia, seeking injunctive relief in the form of an absolute prohibition on voting by the Reserve Bank members of the

---

2. Hearings before the House Banking and Currency Committee on H.R. 7230, 75th Cong., 3d Sess. 56 (1938).

3. Hearings before the Subcommittee on Domestic Finance of the House Committee on Banking and Currency "The Federal Reserve System After Fifty Years," 88th Cong., 2d Sess. 37 (1964).

4. H.R. 7001, after consideration by the Subcommittee on Domestic Monetary Policy, was forwarded as a clean bill, H.R. 8223, to the Committee on Banking on October 1, 1980. The bill died within this Committee.

FOMC. (J.A. at 8) In an opinion by District Judge Gesell, the court dismissed the action for lack of standing. *Riegle v. Federal Open Market Committee, supra*, at 116. The court reasoned that

> Senator Riegle's injury is of a political nature, deriving solely from the acts or omissions of his colleagues and not in any way from the actions of the named defendants. *Reuss v. Balles, supra* 584 F.2d at 468. . . . What the Court must decide is whether or not a Congressman from either chamber has standing to challenge the constitutionality of a statutory provision on which he has failed to persuade his colleagues in the past and remains free to attempt persuasion in the future. The Court concludes that to confer standing upon such a Congressman without more would improperly interfere with the legislative process.

84 F.R.D. at 116 (citations omitted). The decision of the District Court is now before us on appeal.

## II.

■ Senator Riegle alleges that both the defendant individuals, "[b]y acting as officers of the United States when their nominations have never been submitted to the Senate," and the defendant executive agency, "[b]y permitting the defendant individuals to act as officers of the United States when their nominations have never been submitted to the Senate," deprive him of his constitutional right to vote in determining the advice and consent of the Senate to the appointment of the five Reserve Bank members of the FOMC. (Complaint, J.A. at 11) When ruling on a motion to dismiss for want of standing, "both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). We assume, therefore, that the procedure for constituting the FOMC contained in 12 U.S.C. § 263(a) of the Act results in a deprivation of Senator Riegle's constitutional right to advise and consent regarding the appointment of the defend-

ant officers of the executive branch. Senator Riegle seeks not declaratory relief but rather "an injunction against their [five Reserve Bank members] *voting* as members of the FOMC, conduct which deprives him of *his* right to vote in determining the advice and consent of the Senate to the appointment of officers at the highest level of government." (Br. of Riegle at 43) (Emphasis in original)

■ Two contradictory principles pervade the opinions of this court concerning the standing of congressional plaintiffs. First, no distinctions are to be made between congressional and private plaintiffs in the standing analysis. As we stated in *Harrington v. Bush*, 180 U.S.App.D.C. 45, 553 F.2d 190, 204 (1977) (emphasis omitted), "there are no special standards for determining Congressional standing questions." Second, this court will not confer standing on a *congressional plaintiff* unless he is suffering an injury that his colleagues cannot redress. When congressional plaintiffs have sought to accomplish in this court what they were unable to persuade their colleagues to do, we have usually refused to confer standing because of our concern for non-interference in the legislative process. *See, e. g., Reuss v. Balles, supra; Harrington v. Bush, supra. Cf. Kennedy v. Sampson*, 167 U.S.App.D.C. 192, 511 F.2d 430 (1974), holding that nullification of a senator's vote due to pocket veto of bill by the President constitutes sufficient injury to confer standing; *Goldwater v. Carter*, 199 U.S.App.D.C. 115, 617 F.2d 697 (en banc), holding that disenfranchisement of a senator because of the attempt by the President to terminate the Taiwan Treaty without the advice and consent of the Senate is injury sufficient to confer standing, *judgment vacated*, 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (*mem.*). We believe that these two contradictory principles create unnecessary confusion when applied to suits brought by congressional plaintiffs. As the former Chief Judge of this court recently observed,

> There can be no peaceful coexistence between, on the one hand, the notion that

legislators are treated like any other plaintiff for standing purposes, and, on the other, the idea that courts should rigorously scrutinize whether the congressional plaintiff's true quarrel is with his colleagues, rather than the executive. There is no general requirement that a private litigant employ self-help before seeking judicial relief. Nor should there be, because an ordinary plaintiff, having suffered injury in fact within the contemplation of the law he invokes, is entitled to his day in court. If the plaintiff passes the standing test and presents a justiciable dispute, it is assumed that the political branches have decided to commit such disputes to the judiciary and, barring extraordinary circumstances, that is a judgment which courts are bound to respect. Hon. Carl McGowan, "Congressmen in Court: The New Plaintiffs," 15 Ga.L.Rev. 241, 254–255 (1981) (McGowan) (citations omitted). Accordingly we shall proceed by applying to this case the traditional standing tests for non-congressional plaintiffs gleaned from opinions of the Supreme Court. Thereafter, we shall examine what additional considerations, if any, must enter our analysis by virtue of the plaintiff's status as a Member of the United States Senate.[5]

■ The Supreme Court in *Ass'n of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), established a two-part test for standing: injury (i) in fact and (ii) to an interest "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Id.* at 152–53, 90 S.Ct. at 829. A causation requirement was added in *Warth v. Seldin, supra*, 442 U.S. at 505, 95 S.Ct. at 2208: the plaintiff must prove that "the asserted injury was the consequence of the defendants' actions, or that prospective relief will remove the harm." This causation requirement was elaborated upon in *Simon*

*v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 41–42, 45, 96 S.Ct. 1917, 1925–26, 1927, 48 L.Ed.2d 450 (1976), where the Court observed that "the 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." Again, however, the Court stated the causation requirement in the alternative, quoting *Warth v. Seldin, supra*: the causation requirement is satisfied if the plaintiff establishes that the injury was "the consequence of the defendants' actions" or that exercise of the court's remedial powers would redress the injury. 426 U.S. at 45, 96 S.Ct. at 1927. *See also Duke Power Co. v. North Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 74, 98 S.Ct. 2620, 2631, 57 L.Ed.2d 595 (1978). Although recent cases have suggested a slight relaxation of the above tests, *see, e. g., Duke Power, supra* at 80–81, 98 S.Ct. at 2634, the three requirements stated above represent the maximum burden which a plaintiff must bear to attain standing: establishment of (i) injury-in-fact (ii) to an interest protected by the relevant law (iii) where the injury is caused by defendants' actions or capable of judicial redress.

■ We think it may be argued plausibly that Senator Riegle has met the above burden. First, assuming that the five Reserve Bank members of the FOMC are officers who must be appointed with the advice and consent of the Senate, Riegle's inability to exercise his right under the Appointments Clause of the Constitution is an injury sufficiently personal to constitute an injury-in-fact. As the Court observed in *Warth v. Seldin, supra* 442 U.S. *at* 498–99, 95 S.Ct. at 2204–05, the plaintiff must allege " 'such a personal stake in the outcome of the controversy' as to warrant *his* invocation of feder-

---

5. By postponing consideration of this court's congressional standing opinions until the latter part of the discussion, we seek to illustrate the conceptual imprecision which results from attempts to achieve through standing analysis the resolution of those separation-of-powers problems peculiar to congressional plaintiff cases. *See generally*, McGowan, *supra*; Note, "Congressional Access to the Federal Courts," 90 Harv.L.Rev. 1632 (1977).

al-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." Second, with regard to the causation requirement, we note that the named defendants in this action (the five Reserve Bank members of the FOMC) are not the causes of the injury to Senator Riegle. The five Reserve Bank members were elected by the directors of the Federal Reserve Banks. It is these directors, rather than the five FOMC members in question, who are exercising an appointment power which deprives Senator Riegle of his right to vote on determining the advice and consent of the Senate to the appointments of officers. Thus, the requirement that "the asserted injury was the consequence of the defendants' actions," *Warth v. Seldin, supra*, has not been met. However, as noted above at page 10, the causation requirement can also be met by showing that "prospective [judicial] relief will remove the harm." *Warth v. Seldin, supra*. Because it is within the power of this court to redress the alleged injury by holding that 12 U.S.C. § 263(a) is unconstitutional, the causation requirement has been satisfied despite the naming of inappropriate defendants.[6] Third, the interest which Riegle claims was injured by defendants' action (his right to advise and consent to the appointment of officers of the executive branch) is within the zone of interests protected by the Appointments Clause of the Constitution, *supra*. In short, although there is room for argument as to

whether Senator Riegle clearly satisfies all requirements of the most stringent version of the Supreme Court's standing test, we think it reasonable to hold that he has standing.[7]

### III.

Appellant's status as a Member of the United States Senate, however, raises separation-of-powers concerns which are best addressed independently of the standing issue. As we observed *supra* at pages 8–9, the principle that a legislator must lack collegial or "in-house" remedies before this court will confer standing has been a theme of our congressional plaintiff opinions. This principle is a departure from traditional standing analysis because it violates the principle of equality between legislator and private plaintiffs; non-legislator plaintiffs are not routinely denied standing because of the presence of an alternative remedy. Moreover, the inappropriateness of the collegial remedy principle as an aspect of congressional standing analysis has resulted in its inconsistent application in the case law of this court. For example, in *Public Citizen v. Sampson*, 379 F.Supp. 662 (D.D.C. 1974), *aff'd mem.*, 169 U.S.App.D.C. 301, 515 F.2d 1018 (1975), *Harrington v. Bush, supra*, 553 F.2d at 212–214, and *Reuss v. Balles, supra*, 584 F.2d at 468, standing was withheld from congressional plaintiffs in part because their power to vote, i. e., to enact

---

**6.** Although it can be argued that the Senate rather than the directors of the Federal Reserve Banks has, through the passage of 12 U.S.C. § 263(a) of the Act, caused Riegle's injury, to conclude therefrom that the Senator would not satisfy the first formulation of the causation test even had he named the Bank directors as defendants would violate the principle of equality between private and congressional plaintiffs in the standing inquiry. When a plaintiff alleges injury by unconstitutional action taken pursuant to a statute, his proper defendants are those acting unconstitutionally under the law (i. e., the Bank directors), and not the legislature which enacted the statute. *See generally, Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 175–80, 2 L.Ed. 60 (1803).

**7.** This case differs from *Reuss v. Balles, supra* at note 1, where standing was denied to a congressman who claimed, in part, that im-

proper delegation of responsibilities to the FOMC resulted in usurpation of his powers under Article I, sec. 8 of the Constitution to coin and regulate the value of money, to regulate commerce, and to borrow money on the credit of the United States. *Id.* 584 F.2d at 467. The court noted in the *Reuss* case that judicial relief could not possibly cure the alleged injury, for even were the court to require that all FOMC members be presidential appointees, the Committee would retain delegated powers and the congressman's role in setting monetary policy would not be enhanced by the judicial relief he sought. In this case, on the other hand, judicial relief in the form of invalidation of 12 U.S.C. § 263(a) would prevent the directors of the Banks from exercising their allegedly unconstitutional appointment power as well as render invalid the appointments of the five Reserve Bank members of the FOMC.

legislation to cure the alleged injury, remained unimpaired. Yet in *Kennedy v. Sampson, supra*, the court conferred standing on Senator Kennedy to challenge the legality of an attempted pocket veto of a bill for which he had voted. We reasoned that executive impairment of the Senator's past vote had nullified Kennedy's legislative power. *Id.* at 511 F.2d 436. The Senator had, however, collegial remedies comparable to those which negated standing in the *Public Citizen, Harrington,* and *Reuss* cases; Senator Kennedy's power to reintroduce the relevant legislation in the next session of Congress and to vote thereon remained unimpaired. In *Goldwater v. Carter, supra,* this court's most recent opinion regarding congressional standing, legislator plaintiffs were again granted standing despite the presence of adequate collegial remedies. The plaintiffs in the *Goldwater* case were a small group of senators and representatives who asserted that President Carter could not terminate the Mutual Defense Treaty with Taiwan without either a two-thirds vote of the Senate or a majority of both houses of Congress. A majority of this court reasoned that the plaintiffs had been "disenfranchised" by the President's action because a requisite number of senators could never force an unwilling Senate to vote on a declaration of their right to block rescission of the Taiwan Treaty, nor was there any assurance that the President would heed any Senate action. 617 F.2d at 702–703. Yet collegial remedies existed because Senate resolutions regarding the Treaty were pending at the time. McGowan, at 247–48. On appeal the Supreme Court vacated our judgment on the grounds that the plaintiffs did not pose a justiciable question. 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (*mem.*) The Court ignored the standing concept altogether and, in separate opinions by Justices Powell and Rehnquist, neither of which gained a major-

ity of the Court, relied upon the doctrines of ripeness and political question, respectively. *Id.* at 997, 1002, 100 S.Ct. at 534–37.

If, as the ultimate disposition of *Goldwater v. Carter* suggests, the Supreme Court does not believe that the standing doctrine is capable of reflecting the prudential concerns raised by congressional plaintiff suits, this court ought not persist in the attempt to make it do so. The doctrinal difficulties presented by an attempt to reconcile our denial of congressional standing in the *Public Citizen, Harrington,* and *Reuss* cases, on the one hand, with our conferral of legislator standing in the *Kennedy* and *Goldwater* cases, on the other, suggest that

> [t]he use of the standing doctrine to address the separation-of-powers concerns arising when federal legislators sue the executive branch in federal court is fraught with difficulties both in theory and in application. Although it has been the most popular method of judicial self-restraint in these cases, the recent Supreme Court decision in *Goldwater,* which made no use of the term, suggests that its day may have passed insofar as these lawsuits are concerned.

McGowan, at 256. Moreover, we are convinced that the doctrines of ripeness and political question are no "more elegant in their conception [n]or more satisfying in their execution" than the standing concept as a means of articulating our prudential concerns in congressional plaintiff cases. McGowan, at 256–261. The political question doctrine justifies a finding of nonjusticiability primarily when there is an explicit textual commitment of the controversy to a non-judicial branch of government for resolution. *Id.* at 258. In the case under review, the Appointments Clause of the Constitution has no such textual commitment of the advice and consent issue exclusively to the legislature.[8] On the contrary,

---

8. The Appointments Clause of the Constitution, Art. II, sec. 2, cl. 2, reads as follows:

> [The President] shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for,

"[n]othing in articles II or III [of the Constitution] suggests that, assuming the court has jurisdiction, anyone but the judicial branch should decide this question." McGowan, at 258. In short, a clear constitutional or statutory prohibition of judicial review will surely not be present in many cases where prudential concerns nevertheless warrant a court in finding it improper for a congressional plaintiff to invoke the judicial power. As to ripeness, one can conceive of instances when executive action has been taken which may create a situation ripe for judicial review (this case, for example), but separation-of-powers concerns justify judicial restraint. Neither the ripeness nor political question doctrine, in summary, is sufficiently catholic in formulation or flexible in application to resolve the prudential issues arising in congressional plaintiff cases.

The most satisfactory means of translating our separation-of-powers concerns into principled decisionmaking is through a doctrine of circumscribed equitable discretion. Where a congressional plaintiff could obtain substantial relief from his fellow legislators through the enactment, repeal, or amendment of a statute, this court should exercise its equitable discretion to dismiss the legislator's action. For the reasons set forth below, this test avoids the problems engendered by the doctrines of standing, political question, and ripeness. The standard would counsel the courts to refrain from hearing cases which represent the most obvious intrusion by the judiciary into the legislative arena: challenges concerning congressional action or inaction regarding legislation. Yet this standard would assure that nonfrivolous claims of unconstitutional action which could only be brought by members of Congress will be reviewed on the merits.

The above standard would counsel dismissal of a congressional plaintiff's claim in cases concerning legislative action or inaction because it is in these cases that the plaintiff's dispute appears to be primarily with his fellow legislators. In these circumstances, separation-of-powers concerns are most acute. Judges are presented not with a chance to mediate between two political branches but rather with the possibility of thwarting Congress's will by allowing a plaintiff to circumvent the processes of democratic decisionmaking. "This meddling with the internal decisionmaking processes of one of the political branches extends judicial power beyond the limits inherent in the constitutional scheme for dividing federal power." McGowan, at 251. See, e. g., Harrington v. Bush, supra, 553 F.2d at 214; Holtzman v. Schlesinger, 484 F.2d 1307 (2d Cir. 1973). Thus, where a congressional plaintiff has standing to challenge the actions of those acting pursuant to a statute which could be repealed or amended by his colleagues, or where he alleges an injury which could be substantially cured by legislative action, our standard would counsel judicial restraint. In all such cases, it is unlikely that an unconstitutional action or statute would go unreviewed. While we discourage congressional plaintiffs in such circumstances, it is probable that a private plaintiff could acquire standing to raise the issue of unconstitutionality before a court. Because such a private plaintiff's suit would not raise separation-of-powers concerns, the court would be obliged to reach the merits of the claim. In this case, for example, although prudential considerations warrant the dismissal of Senator Riegle's claim, one can easily conceive of a private plaintiff who could acquire standing to bring a similar claim. A person with significant economic interests in the open securities markets and prime lending rates, e. g., a major corporation, pension fund, or other major investor, might qualify for standing to challenge the constitutionality of a procedure which allegedly permits improperly appointed officials to so substantially influence the monetary policy of the United States, open market trading, and prime rates.

and which shall be established by Law; but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

When a congressional plaintiff brings a suit involving circumstances in which legislative redress is not available *or* a private plaintiff would likely not qualify for standing, the court would be counseled under our standard to hear the case. Thus, such actions as impeachment, expulsion proceedings, impoundment, and certain acts of the executive not subject to direct legislative redress or private party challenge (*e. g.*, the pocket veto in *Kennedy v. Sampson, supra*) would be subject to judicial review in a congressional plaintiff case. These circumstances (which are not intended to exhaust the possibilities) represent situations where absent congressional plaintiff actions, it is possible that non-frivolous claims of unconstitutional action would go unreviewed by a court.

In short, our standard would counsel dismissal of congressional plaintiff actions only in cases in which (i) the plaintiff lacks standing under the traditional tests, or (ii) the plaintiff has standing but could get legislative redress and a similar action could be brought by a private plaintiff. Nondiscriminatory application of standing principles warrants dismissal of the action in the former circumstance; non-interference in the legislative process counsels dismissal in the latter situation. We would welcome congressional plaintiff actions involving non-frivolous claims of unconstitutional action which, because they could not be brought by a private plaintiff and are not subject to legislative redress, would go unreviewed unless brought by a legislative plaintiff. In this last situation, there are no prudential considerations or separation-of-powers concerns which would outweigh the mandate of the federal courts to "say what the law is". *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803).

In this case there can be no doubt that Senator Riegle's congressional colleagues are capable of affording him substantial relief. Indeed, a bill which would accomplish Senator Riegle's objective was introduced in Congress as recently as 1980. *See* note 4 *supra*. The Senator remains free to attempt to persuade his fellow legislators of the wisdom of his views. His colleagues, if so persuaded, are empowered to redress the alleged inadequacies of 12 U.S.C. § 263(a) of the Act through amending legislation. Senator Riegle's attempt to prohibit voting by the five Reserve Bank members of the FOMC is yet another skirmish in the war over public versus private control of the Committee which has been waged in the legislative arena since 1933. It would be unwise to permit the federal courts to become a higher legislature where a congressman who has failed to persuade his colleagues can always renew the battle.

Assuming that the current procedure for constituting the FOMC may be unconstitutional, we must nevertheless weigh the danger of permitting such a statute to stand against two countervailing concerns: (1) the potential for misuse of the judicial system inherent in hearing a case brought by this particular plaintiff, who, because of his congressional status, has adequate collegial remedies; and (2) the unwarranted interference in the legislative process which judicial action would represent at this time. We conclude that rendering a decision on the merits in this case would pose a greater threat to the constitutional system than would the principled exercise of judicial restraint. As Judge Gesell perceptively recognized, we should not "improperly interfere with the legislative process." 84 F.R.D., *supra* at 116.

We hold that Senator Riegle has standing to bring this action but exercise our equitable discretion to dismiss the case on the ground that judicial action would improperly interfere with the legislative process.

The judgment dismissing the complaint is

*Affirmed.*