**Jesse HELMS, et al., Plaintiffs,**

v.

**SECRETARY OF The TREASURY, et al., Defendants.**

**Civ. A. No. 87–1141.**

United States District Court, District of Columbia.

June 29, 1989.

Carl Shipley and Marion H. Smoak, Shipley, Smoak, Henry & Holdgreiwe, Washington, D.C., for plaintiffs.

Vincent Garvey and Mona Butler, U.S. Dept. of Justice, Washington, D.C., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

In October 1986, over Presidential veto, Congress passed the Comprehensive Anti-Apartheid Act of 1986 ("CAAA"), Pub.L. 99-440, 100 Stat. 1086 et seq. (October 2, 1986). Toward its goal of ending apartheid,[1] Congress imposed a number of sanctions on South Africa, including a prohibition on new investments and loans to South Africa and a general prohibition of imports and exports of raw materials and agricultural products. §§ 301-323. Congress defined the term South Africa to include "any territory under the Administration, legal or illegal, of South Africa ...," § 3(6)(B). And as part of its goal to "undermine apartheid," Congress also outlined the United States' policy toward the "other states of southern Africa." In this section Congress stated, inter alia, the CAAA was intended to "... secure the independence of Namibia ... in accordance with appropriate United Nations Security Council regulations." § 104(b)(1). Namibia, South Africa's northwestern neighbor, has been under de facto control of the government of South Africa since World War II[2]. Notwithstanding current changes in the administration of Namibia and "an April 1990 target date for full independence," New York Times, April 2, 1989, at 14, col. 3, both the United States and the United Nations continue to consider Namibia a "non-self-governing territory under the United Nations Charter." See Department of State's Analysis of H.R. 2589, Letter to Chairman, Subcommittee on Africa, Committee on Foreign Affairs, House of Representatives, October 29, 1985, Hearing before the Subcommittee on Africa of the House Committee on Foreign Affairs, 99th Cong., 1st Sess. 154-59.

The CAAA entitles the Executive branch to take various measures to enforce its provisions, §§ 208(c), 208(d), 601, 603(a), and pursuant to this directive, the Departments of State and Treasury issued various implementing regulations, applying them with equal force to Namibia. See, e.g., 22 C.F.R. Parts 60-65, 51 Fed.Reg. at 39656; 31 C.F.R. §§ 545.306, 545.312, 51 Fed.Reg. at 41908. This action tests the constitutionality of these interpretive regulations.

On April 4, 1987 Senator Jesse Helms, five other members of Congress ("congressional plaintiffs"), and six "commercial plaintiffs"[3] brought this declaratory judgment action against the Departments of State and Treasury, seeking, inter alia, a declaration that the defendants' inclusion of Namibia as a target for anti-apartheid sanctions is unconstitutional Article I and Fifth Amendment violations and violative of the Administrative Procedure Act ("APA"), the United Nations Charter, various United States treaty obligations, and common law.

Both the congressional and commercial plaintiffs assert that Namibia has established a "non-racial, democratic form of government" which meets the criteria of the CAAA. Together the plaintiffs assert that Treasury and State's regulations are arbitrary and capricious, were promulgated without a hearing, and, hence, violate the APA. The congressional plaintiffs allege, inter alia, that they represent the interests of their constituents who are being injured

---

1. The Act's purpose was to provide "a comprehensive and complete framework to guide the efforts of the United States in helping to bring an end to apartheid in South Africa" and "sets out United States policy toward the Government of South Africa ... and the other states in southern Africa."

2. The effect of the CAAA on Namibia is the particular focus of the Complaint.

3. The commercial plaintiffs include Council on South Africa, Washington Fish Exchange, Inc., Nakara Manufacturing Furriers, Policy Analysis, Inc., and individuals Ibenstein Teppiche and Dorka Teppiche. The individuals are Namibian citizens.

economically by the interruption of trade and that they have been denied their right to vote on whether Namibia should be targeted for sanctions. The commercial plaintiffs separately allege that they have been deprived of their Fifth Amendment right to engage in trade with Namibia. The congressional plaintiffs seek a declaration that neither State nor Treasury has the constitutional authority to "usurp the President's exclusive authority over U.S. foreign relations."

At this juncture we are confronted with defendants' motion to dismiss under Rule 12(b), Federal Rules of Civil Procedure. At this stage of the proceedings, the only relevant factual issues are those alleged in plaintiffs' complaint which we must accept as true for the purposes of this motion and from which all favorable inferences must be drawn.

I

*Subject Matter Jurisdiction*

■ At the outset, this court reiterates that "there is a significant difference between determining whether a federal court has 'jurisdiction over the subject matter'" presented in the complaint and determining whether a cause over which a court has subject matter jurisdiction is appropriate for judicial consideration. *Powell v. McCormack*, 395 U.S. 486, 512, 89 S.Ct. 1944, 1959, 23 L.Ed.2d 491 (1969); *Baker v. Carr*, 369 U.S. 186, 198, 82 S.Ct. 691, 700, 7 L.Ed.2d 663 (1962). Article III of the Constitution confers subject matter jurisdiction on a federal court if the "case or controversy" "arises" under a provision of the United States Constitution, a law of the United States, or a treaty, or by some statutory grant of jurisdiction. Generally, a complaint that is couched in constitutional or statutory terms, as is the present action, may be dismissed only if the asserted federal claims are "unsubstantial and frivolous." *Baker*, 369 U.S. at 199, 82 S.Ct. at 700. Because plaintiffs satisfactorily allege both statutory and constitutional violations, this court assumes jurisdiction over the subject matter of the complaint.

*Standing*

This determination begins rather than ends the court's analysis, for the Article III "case or controversy" provision further limits the jurisdiction of federal courts "to adjudge the legal rights of litigants in actual controversies." *Liverpool S.S. Co. v. Commissioners of Emigration*, 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885). The "case or controversy" limitation mandates that a federal court act only to redress injury that "fairly can be traced to the challenged action of the defendant." *Riegle v. Federal Open Market Committee*, 656 F.2d 873, 878 (D.C.Cir.), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981). "As an incident ... to this bedrock requirement," the litigant is required to have "standing" to bring the suit, to wit, the litigant must show an injury-in-fact, traceable to the challenged action, that is "likely to be redressed by a favorable decision." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 471–74, 102 S.Ct. 752, 757–58, 70 L.Ed.2d 700 (1982). Considering the profound effect that the exercise of judicial power has on "the lives, liberty, and property of those to whom it extends," it is not an understatement to assert that in no instance is the standing requirement more important than when a federal court is called upon to declare an act of the Legislative or Executive Branch unconstitutional. *See id.* at 473, 102 S.Ct. at 759.

■ The standing principle applies with equal force to members of Congress. *See United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1381–82 (D.C.Cir.1984); *Riegle v. Federal Open Market Committee*, 656 F.2d at 877; *Kennedy v. Sampson*, 511 F.2d 430 (D.C.Cir.1974). A member of Congress who invokes the federal question jurisdiction must allege an injury-in-fact that is both "'specific and cognizable,' arising out of an interest 'positively identified by the Constitution,'" *United Presbyterian Church*, 738 F.2d at 1381, (quoting *Moore v. United States House of Repre-*

**1358**

*sentatives*, 733 F.2d 946 (D.C.Cir.1984)). The injury-in-fact requirement also demands that a complaint allege more than "generalized, amorphous injuries due to ... the conduct of the Executive," or generalized grievances that the member's "effectiveness is diminished by allegedly illegal activities taking place outside the legislative forum." *Id.* For a member of Congress to attain standing, therefore, proof of injury-in-fact together with a showing of an interest protected by the Constitution or federal law remains a significant hurdle. This is true even at the earliest stages of the proceedings, for example, on a motion to dismiss, when we must assume the truth of the allegations of the complaint and the burden on the plaintiff is particularly light. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974).

*Justiciability*

■ Generally, after a determination is made that the court has jurisdiction over the subject matter of the suit, a court must decide whether "the duty asserted can be judicially identified and its breach judicially determined, and whether the protection for the right asserted can be judicially molded." *Baker v. Carr*, 369 U.S. at 198, 82 S.Ct. at 700. In making that determination a court is required to ask, "(i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention?" *Goldwater v. Carter*, 444 U.S. 996, 998, 100 S.Ct. 533, 534, 62 L.Ed.2d 428 (1979) (Powell, J., concurring). At bottom, this is an articulation of the political question doctrine, which forecloses inquiry into the propriety and wisdom of political decisions based on executive discretion. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 165–66, 2 L.Ed. 60 (1803). In this Circuit, however, congressional suits have elicited an alterna-

tive initial analysis. In reaction to a proliferation of congressional suits in which federal legislators, having failed to achieve their purpose on the floor of the Senate or the House, sue the Executive branch in federal court, the District of Columbia Circuit has developed the novel prudential doctrine of "equitable discretion" [4] which bypasses both standing and justiciability analyses. Under the "equitable discretion" doctrine, a federal court simply chooses not to hear a case, believing that a proper resolution of the controversy lies through the legislative process. The invocation of this doctrine effectively forecloses a member of Congress from seeking this court's jurisdiction to test the validity of a statute "passed over an objecting vote." *Melcher v. Federal Open Market Committee*, 836 F.2d 561 (D.C.Cir.1987); *Riegle v. Federal Open Market Committee*, 656 F.2d 873 (D.C.Cir.), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981); *cf. Kennedy v. Sampson*, 511 F.2d 430 (D.C.Cir. 1974); *Pressler v. Simon*, 428 F.Supp. 302 (D.D.C.1976); *see also Coleman v. Miller*, 307 U.S. 433, 59 S.Ct. 972, 83 L.Ed. 1385 (1939). In some instances, these suits have been dismissed for lack of standing because the congressional plaintiffs were unable to demonstrate that their claims were "founded on a an injury to the legislature by the distortion of the process by which a bill becomes law," *Moore v. House of Representatives*, 733 F.2d 946 (D.C.Cir.1984). In others, courts have simply dismissed the congressional actions without reaching the issue of standing. They rely instead on this Circuit's "recently minted" and intervening "equitable discretion" doctrine on the ground that "the congressional plaintiff could clearly receive substantial relief from his congressional colleagues in the form of enactment of a new statute or repeal or amendment of the statute in question." *Humphrey v. Baker*, 848 F.2d 211, n. 4 (D.C.Cir.1988) (dismissing plaintiffs' complaint under the equitable discretion doctrine without reaching standing or justicia-

---

**4.** This doctrine has been variously described as "circumscribed equitable discretion" and "remedial discretion." *See Vander Jagt v. O'Neill*, 699 F.2d 1166, 1172 (D.C.Cir.), *cert. denied*, 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983).

bility); *Gregg v. Barrett*, 771 F.2d 539, 544 (D.C.Cir.1985); *see United Presbyterian*, 738 F.2d at 1381 (stating that the substitution of the equitable discretion doctrine for standing is not complete).

■ Although plaintiffs assert a number of grounds in support of their contention that the actions of the Departments of State and Treasury usurp the function of Congress and the Executive, none of the Executive's actions with respect to Namibia precludes the congressional plaintiffs from amending or repealing the CAAA. That these plaintiffs have the relief they seek through the exercise of their own legislative power is amply demonstrated by the fact that plaintiff Senator Helms recently introduced legislation to repeal the CAAA. S. 522, 101st Cong., 1st Sess., 135 Cong.Rec. 2265 (January 3, 1989); *see also* S.Res. 300, 100th Cong., 1st Sess., 133 Cong.Rec. 14,903 (1987) (calling on the President to terminate economic sanctions against Namibia). Recognizing that this doctrine has undergone some anomalous applications, and that the viability of this court-fashioned doctrine has been questioned, *see Humphrey v. Baker*, 848 F.2d 211 (1988); *Melcher v. Federal Open Market Committee*, 836 F.2d at 565 (Edwards, J., concurring), "equitable discretion" is, nonetheless, the law of this jurisdiction and "must be followed until rejected by this Circuit *en banc* or the Supreme Court." *Melcher*, 836 F.2d at 565. The court holds, therefore, it would be an abuse of discretion for the court to entertain the congressional plaintiffs' action with respect to the allegations that as members of Congress they have been denied their right to vote on whether Namibia should be included in the Departments of State and Treasury's implementing regulations.

## II

### *Violations of the U.N. Charter, International Law, and Customary Law*

■ Both sets of plaintiffs contend that the CAAA and the Departments of State

and Treasury regulations are violations of "rights" derived from various articles of the United Nations Charter, international law, and customary law. However, none of these alleged "violations" are legally cognizable under the facts of this case and must be dismissed. It is unchallenged that under the express language of the Constitution, Article VI, cl. 2, a treaty made under the authority of the United States is the "supreme law of the land," *see United States v. Belmont*, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937). However, treaty clauses must confer a right on an individual in order for that individual to assert a claim "arising under" them. *Committee of U.S. Citizens In Nicargua v. Reagan*, 859 F.2d 929, 937 (D.C.Cir.1988). No such right is alleged here. Therefore, plaintiffs' claim that the CAAA violates the U.N. Charter is without merit and must be dismissed.[5]

■ Plaintiffs also challenge the CAAA under principles of customary and international law. However, it is equally true of both customary and international law that "where there is no treaty, and no controlling executive or legislative act or judicial decision, resort must be had to the customs and usages of nations." *The Paquete Habana*, 175 U.S. 677, 700, 20 S.Ct. 290, 299, 44 L.Ed. 320 (1900). However, plaintiffs' action is foreclosed because "[n]o enactment of Congress can be challenged on the ground that it violates customary international law." *Committee of U.S. Citizens in Nicaragua*, 859 F.2d at 939. We conclude, therefore, that plaintiffs have failed to state a cause of action with respect to their claims of violations of customary and international law.

## III

### *Fifth Amendment Claims*

■ As an initial matter the court agrees that the "Executive's power to conduct foreign relations free from the unwarranted

---

5. Moreover, subsequent inconsistent statutes, if this statute is viewed in that manner, displace "conflicting treaty provisions for purposes of

domestic law." *Committee of U.S. Citizens in Nicaragua*, 859 F.2d at 936.

supervision of the Judiciary cannot give the Executive *carte blanche* to trample the … property rights of this country's citizenry," *Ramirez de Arellano v. Weinberger,* 745 F.2d 1500, 1515 (D.C.Cir.1984) (*en banc*), *vacated on other grounds,* 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985). However, it is equally true that an Act of Congress is sufficient to confer that power on the Executive. *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952). However, in analyzing a Fifth Amendment "takings" claim a court's first inquiry is whether the plaintiffs have a property interest protected by the Fifth Amendment. Under this analysis, the commercial plaintiffs' Fifth Amendment action must be dismissed as fundamentally deficient.[6] To assert a Constitutional violation plaintiffs must demonstrate a "judicially cognizable interest in the affected property sufficient to enable them to sue for an unconstitutional deprivation of the use and enjoyment of that private property." *Ramirez de Arellano,* 745 F.2d at 1516. Plaintiffs have not alleged any fact that convinces us that the CAAA or the enabling regulations have disturbed any property interest held by plaintiffs. Rather plaintiffs simply allege in the most vague and conclusory terms that the CAAA has curtailed an alleged Fifth Amendment right "to engage in business," Plaintiffs' Opposition to Motion to Dismiss at 12–13, which constitutes "a deprivation of private property for public purposes without just compensation." Complaint, ¶¶ 34, 40(b), 40(c). The court is not aware of any Fifth Amendment right to engage in business. Assuming the factual allegations of the complaint are true, as is required under a 12(b) motion, *District of Columbia v. Air Florida, Inc.,* 750 F.2d

1077, 1081 (D.C.Cir.1984), we fail to find a cognizable claim upon which the private plaintiffs can hang their hats. Therefore, plaintiffs' Fifth Amendment claims are to be dismissed.[7]

## IV

### *APA Violations*

■ Finally, plaintiffs assert that Treasury and State's regulations are arbitrary and capricious, were promulgated without a hearing, and, hence, violate the APA. The court's first inquiry is whether the Executive has authority for its actions, either through its plenary power to regulate foreign affairs or by the power delegated to it through the plenary authority of Congress to regulate foreign commerce. *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974). "A constitutional delegation of powers requires that Congress state a policy or objective for the President to execute and also that it establish a standard or 'intelligible principle' that makes clear when action is proper." *Mast Industries, Inc. v. Regan,* 596 F.Supp. 1567 (Ct.Int'l Trade 1984) (quoting *Star–Kist Foods, Inc. v. United States,* 275 F.2d 472, 480 (1959)). We find that the Departments of State and Treasury were acting under the express authority of the CAAA, *see* CAAA §§ 208(c), 208(d), 601, 603(a), and within the stated purpose of the CAAA, § 4 (Purpose Statement). A second inquiry is whether the Executive's action complies with relevant APA procedural requirements for rulemaking. However, in making that inquiry we recognize that the APA exempts regulations that fall within the "foreign affairs function" from the notice and comment and hearing requirements normally applicable

---

**6.** Although plaintiffs allege a Fifth Amendment violation in their complaint, their opposition to defendants' motion does not address defendants' arguments for dismissal. Nonetheless the court discusses the points raised in plaintiffs' complaint.

**7.** Contrary to defendants' assertion in its Motion to Dismiss that even if the plaintiffs could establish a legally cognizable property interest, their claims would be adjudicable only by the Court of Claims, *see* The Tucker Act, 28 U.S.C. § 1491

(providing that in claims against the U.S. government in excess of $10,000 the Court of Claims "shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress, or any regulation of an executive department…."), this court is empowered to grant declaratory relief under the Fifth Amendment. *Ramirez de Arellano,* 745 F.2d at 1533.

to agency rulemaking, 5 U.S.C. §§ 553(a)(1) (Rulemaking), 554(a)(4) (Adjudication); *Mast Industries, Inc. v. Regan,* 596 F.Supp. 1567 (Ct.Int'l Trade 1984), *provided* that the subject matter of the regulations themselves " 'is clearly and directly involved' in a 'foreign affairs function.' " *Mast Industries,* 596 F.Supp. at 1582 (quoting Legislative History of APA at 275 (House Report)); *see also Environmental Defense Fund v. Gorsuch,* 713 F.2d 802 (D.C.Cir.1983). The court finds that the purpose of the regulations is clear and directly related to the foreign affairs function, and, therefore, that the regulations are exempt from the notice and comment provisions of the APA.

*Conclusion*

On the basis of the foregoing this action shall stand dismissed.