Dan L. BURTON, Chuck Douglas, Phillip M. Crane, Robert C. Smith, Members of Congress, Plaintiffs,

v.

James A. BAKER, III, Secretary of State, George H.W. Bush, President of the United States, Defendants.

Civ. A. No. 89–2029 (TPJ).

United States District Court, District of Columbia.

Oct. 31, 1989.

John Oliver Birch, Asst. U.S. Atty., David J. Anderson, Vincent Garvey, Jeffrey G. Knowles, Attys., Dept. of Justice, Washington, D.C., for defendants.

Carl L. Shipley, Thomas C. Henry, Roberts & Henry, Washington, D.C., for plaintiffs.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

Four members of the U.S. House of Representatives sue the President and Secretary of State for a declaratory judgment to the effect that a so-called "side agreement" between the Executive Branch and the Legislative Branch leadership respecting the execution of a certain law is null, void, and of no effect. The case is presently before the Court on cross-motions for summary judgment upon the following undisputed material facts.

## I.

In April, 1989, Congress enacted Public Law No. 101–14, 103 Stat. 37 (1989) (the "Act"), the stated purpose of which was "to implement the Bipartisan Accord on Central America between the President and the Congress signed on March 24, 1989"

1. The letter was, in fact, sent by the Secretary of State on April 28, 1989, to the Congressional leadership and the chairs of House and Senate Foreign Affairs and Appropriations Committees, 10 days after the Act became law.

(hereinafter the "Accord"). The Accord, to which the President, the Speaker of the House, and the House and Senate Majority and Minority Leaders are signatories, declares the Executive and the Congress to be united on a policy to achieve certain goals with regard to Nicaragua, and to that end, *inter alia*, to "act promptly ... to extend humanitarian assistance at current levels to the [Nicaraguan] Resistance, through February 28, 1990." H.R.Rep. No. 23, 101st Cong. 1st Sess., pt. 1, at 2 (April 11, 1989). The Accord, which is *not* a part of the Act and was never put to a vote in either chamber, was accompanied in the committee report by a "draft letter" from the Secretary of State to the Chairmen of the House and Senate Authorization and Appropriation Committees and the Congressional leadership. By the "draft letter" the Secretary proposed to assure its recipients that, although Congress would be voting to continue to provide "humanitarian assistance" through February, 1990, money would not be "obligated [by the Executive] beyond November 30, 1989,"

> except in the context of consultation among the Executive, the Senate Majority and Minority leaders, the Speaker of the House of Representatives and the Minority leader, and the relevant authorization and appropriation committees and only if affirmed via letter from the Bipartisan leadership of Congress and relevant House and Senate authorization committees and appropriation subcommittees.

*Id.* at 4.[1]

Thus assured, Congress passed the Act which authorized the President to transfer an unspecified sum not to exceed $49,750,-000 from unobligated funds of various armed forces appropriation accounts to the Agency for International Development, plus transportation and operating costs, "to provide humanitarian assistance to the Nicaraguan Resistance" through February 28, 1990.[2]

2. Specifically, the operative language of the Act provided in pertinent part that "[t]he President *may* transfer ... up to $49,750,000 ... *to remain available* through February 28, 1990...." Pub.L. 101–14, § 2(a) (emphasis supplied). The

## II.

Plaintiffs contend that the Secretary of State's undertaking for the Executive Branch to secure the approval of selected members of Congress before expending funds under the Act subsequent to November 30, 1989, presumably a *quid pro quo* for the Congressional leadership's assent to the Accord and passage of the Act, represents a constitutional transgression of several orders. It confers upon those select members, they say, the power of a "legislative veto;" it also purports to "amend" a duly enacted law, i.e., the Act, by unilateral Executive Branch fiat, or at least abdicates Presidential responsibility for the conduct of national defense and foreign policy; and it effects a Presidential "impoundment" of funds duly appropriated by Congress to be spent as Congress intended. It is, therefore, a nullity, and should be so declared, the implicit consequence of which will be (although plaintiffs deny a purpose to accomplish it) that the President will be obliged to continue to furnish humanitarian assistance to the Contras through February, 1990, without further permission from the ranks of Congress.

The President and Secretary assert that the complaint should be dismissed, because it presents no justiciable case or controversy over which this or any federal court may exercise jurisdiction for several reasons: the plaintiffs are without standing to maintain the action; the doctrine of "remedial discretion" compels its dismissal; and the dispute presents a non-justiciable political question. Alternatively, defendants ask for summary judgment on the merits on the ground that the so-called "side agreement" commits none of the constitutional sins ascribed to it. It is simply a bilateral political "contract" (and enforceable only as such) for inter-branch consultation on proposed expenditures. Neither the Constitution nor the Act forbid it, or any of its provisions. The President may observe or ignore it, may consult or not, and may spend or not, as he chooses, with only political consequences to follow.

bill, H.R. 1750, passed the House of Representatives, 309 to 110, and the Senate, 89 to 9, on

## III.

Recent D.C. Circuit precedent, which may not be altogether consistent in reasoning but is so in result, clearly warns against the Court's taking jurisdiction of this dispute. Plaintiffs either lack the standing necessary to present a justiciable case or controversy for adjudication, or considerations which have given rise to what is now termed the doctrine of remedial discretion suggest that judicial abstention is required.

Fifteen years ago, in *Kennedy v. Sampson,* 511 F.2d 430 (D.C.Cir.1974), the court of appeals found a U.S. Senator to have standing to maintain an action against officials of the Executive Branch to declare a law to be in force despite the President's attempted pocket veto. In a succession of cases since *Kennedy v. Sampson,* however, the D.C. Circuit (with some subtle encouragement from the Supreme Court) has repeatedly declined to expand its holding to embrace other controversies within or between the political branches. Separation-of-powers concerns have inspired the results, however the several panels have arrived at them.

In *Harrington v. Bush,* 553 F.2d 190 (D.C.Cir.1977), the court found a member of Congress to be without standing to litigate the legality of certain activities of the Central Intelligence Agency. Then, in *Goldwater v. Carter,* 617 F.2d 697 (D.C. Cir.1979) (*en banc*), the court ventured that a U.S. Senator did have standing to contest the President's unilateral termination of a mutual defense treaty with a foreign nation without senatorial consent, but then denied him relief on the merits, only to have its judgment vacated by the Supreme Court which held the controversy to be non-justiciable on other grounds, but couldn't agree on which ground. 444 U.S. 996, 100 S.Ct. 533, 62 L.Ed.2d 428 (1979) (mem.).

After *Goldwater,* the D.C. Circuit had occasion to decide whether a Senator could maintain an action to declare unconstitu-

April 13, 1989, and was signed by the President on April 18, 1989.

tional a statutorily ordained procedure for the appointment of certain officials of the Federal Reserve System without senatorial confirmation. In *Reigle v. Federal Open Market Committee,* 656 F.2d 873 (D.C. Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981), the court of appeals read the Supreme Court's disposition of *Goldwater* as tacit disapproval of standing as the ground upon which intra- or inter-branch litigation by members of Congress should be rejected by the Judiciary when separation-of-powers principles were implicated. It devised the concept of a discretionary abstention from the exercise of jurisdiction in such cases even though technical standing (as it understood the law of standing at the time) could be found. *Id.* at 880–81. Shortly thereafter the court reverted to a standing analysis to deny a Congressman, *qua* legislator, the right to challenge the manner in which a statute was being executed (although the court allowed him to sue as one personally benefitted by the statute) in *American Federation of Government Employees v. Pierce,* 697 F.2d 303 (D.C.Cir.1982).

The debate between the partisans of no-standing versus discretionary abstention was revived two years later in *Vander Jagt v. O'Neill,* 699 F.2d 1166 (D.C.Cir.1983), *cert. denied,* 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983), when the district court's dismissal of a suit by Republican members of Congress against the Democratic congressional leadership alleging unconstitutional discrimination was affirmed by two judges on discretionary grounds, 699 F.2d at 1175, with a third (former Circuit Judge Bork) concurring on the basis of lack of standing. *Id.* at 1177–85.

Since then the court of appeals has decided *Moore v. U.S. House of Representatives,* 733 F.2d 946 (D.C.Cir.1984), affirming the dismissal—on discretionary grounds—of a suit by House members challenging a tax statute that had been first proposed in the Senate and, was thus, alleged to be unconstitutional under the Origination Clause, U.S. Const. art. I, § 7, cl. 1. The court, in an opinion by former Circuit Judge Wilkey, expressly found the plaintiffs' standing sufficient, 733 F.2d at 950–54, with a concurrence in the judgment by then Circuit Judge (now Justice) Scalia urging a failure of standing as the proper ground for decision. *Id.* at 956–965. The Supreme Court denied *certiorari.* 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985).

Only weeks later, in *United Presbyterian Church v. Reagan,* 738 F.2d 1375 (D.C.Cir.1984), writing for a unanimous panel which included Circuit Judge Bork, Judge Scalia affirmed the dismissal of a complaint brought by, *inter alia,* a member of Congress alleging that a Presidential Executive Order respecting the intelligence-gathering activities of government agencies was unconstitutional. In so doing, Judge Scalia adopted the reasons given by the district judge for his discretionary dismissal of the Congressman's complaint as the ground upon which to affirm for want of standing. *Id.* at 1382.[3]

## IV.

■ It is apparent to this Court that, although the debate may continue in the court of appeals as to the proper basis for doing so, the teaching of D.C. Circuit precedent is that lawsuits by members of Congress for declaratory or injunctive relief against either officials of the Executive Branch or their fellow legislators respecting the constitutionality of the way the latter have gone about their business are generally not to be entertained by the Judicial Branch. It is less important that district courts correctly identify the more aca-

**3.** Several months after *United Presbyterian Church* was decided, two circuit judges expressly relied upon *Kennedy v. Sampson* to find standing on the part of members of Congress to challenge another pocket veto by the President in *Barnes v. Kline,* 759 F.2d 21, 26 (D.C.Cir. 1985). The third member of the panel, Circuit Judge Bork, dissented in a lengthy opinion denouncing the concept of "congressional stand-ing" for the violence he saw it doing to the principle of the separation of powers. *Id.* at 41–71. The Supreme Court granted *certiorari,* but then vacated the D.C. Circuit's panel opinion as moot (two justices dissenting), the statute at issue having expired by its own terms in the meantime. *Burke v. Barnes,* 479 U.S. 361, 107 S.Ct. 734, 93 L.Ed.2d 732 (1987).

demically respectable reason for declining to decide such disputes than that they do decline them.

█ The plaintiffs here insist that they are interested only in vindicating the legislative process as established by the Constitution for enacting and executing the laws of the nation. They condemn the so-called "side agreement" as a constitutional aberration, because, by it, the Executive Branch abdicates its responsibility to execute the Act as they expected it to be executed, and also because certain of their fellows have acquired the ability to exercise disproportionate influence over the manner in which it will be executed.

If standing is now the ground of decision of choice in such cases, the Court finds that the plaintiffs have no standing here. They have a collegial remedy: they can persuade a majority of their fellows to change the law or abandon the "side agreement." Alternatively, because the subject matter of both the Bipartisan Accord and the Act involves issues of national defense and foreign policy, the Court finds it to have been committed to the political branches by the Constitution. It would be imprudent for this Court to instruct the President, the Secretary of State, and the Congressional leadership how they must resolve their differences, and it declines to decide the case as a matter of discretion. For both of the foregoing reasons, therefore, the Court concludes that the complaint must be dismissed, and it is, this 31st day of October, 1989,

ORDERED, that defendants' motion for summary judgment of dismissal is granted, and the complaint is dismissed with prejudice.