**Michael E. LOWRY, a Representative from Washington, et al.,**

v.

**Ronald W. REAGAN, President of the United States.**

**Civ. A. No. 87–2196.**

United States District Court, District of Columbia.

Dec. 18, 1987.

**334**

Alan B. Morrison, David C. Vladeck, Public Citizen Litigation Group, Washington, D.C.

Michael J. Glennon, University of California, Davis, Cal.

Robert J. Cynkar, Deputy Asst. Atty. Gen., David J. Anderson, Vincent M. Garvey, Steven L. Zelinger, Anne M. Rossheim, Washington, D.C.

David J. Scheffer, Committee on Foreign Affairs, U.S. House of Representatives, Washington, D.C.

Bari Lee Schwartz, Washington, D.C.

## MEMORANDUM OPINION AND ORDER

REVERCOMB, District Judge.

This matter came before the Court on plaintiffs' Motion for Summary Judgment, defendant's Opposition, defendant's Motion to Dismiss, plaintiffs' Opposition and Reply, and defendant's Reply. A brief in support of defendant's Motion to Dismiss was submitted by *amicus curiae* Representative Howard L. Berman. Both parties filed Replies. Oral argument was heard on November 10, 1987.

Plaintiffs, 110 members of the House of Representatives,[1] contend that the reporting requirement of section 4(a)(1) of the War Powers Resolution, 50 U.S.C. sec. 1543(a)(1) (1982), was triggered by the July 22, 1987 initiation of United States escort operations in the Persian Gulf and by the September 21, 1987 attack on an Iranian Navy ship laying mines in the Persian Gulf. Specifically, plaintiffs contend that United States Armed Forces have been introduced, without a declaration of war, "into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances." 50 U.S.C. sec. 1543(a)(1). Plaintiffs petition this Court to declare that the President was required to file reports concerning both the July and September incidents and to order the President to submit a report concerning continued use of United States Armed Forces in the Persian Gulf within forty-eight hours of the order in this case. For the reasons stated below, the Court declines to accept jurisdiction and DISMISSES this action.

## I. THE WAR POWERS RESOLUTION

The War Powers Resolution,[2] enacted over a presidential veto on November 7, 1973, sets forth procedures intended to guarantee Congress, in the absence of a declaration of war, an active role in all decisions concerning the deployment of United States Armed Forces into hostilities abroad.[3] The procedures set forth in the

---

**1.** The three Senators originally identified as plaintiffs in this lawsuit have withdrawn from the action.

**2.** 50 U.S.C. sec. 1541–1548 (1982). The War Powers Resolution was a joint resolution of both chambers of Congress and, as such, had the force of law. *See* Sutherland, Statutory Construction 496–99 (Sands 4th ed. 1985).

**3.** 50 U.S.C. sec. 1541(a); *see also* 119 Cong.Rec. 36,187 (1973) (statement of Sen. Javits).

Congress viewed its efforts in drafting this Resolution as a "fulfill[ment of] the intent of the framers of the Constitution" regarding the allocation of the war powers between the executive and legislative branches of government. 50 U.S. C. sec. 1541(a). The provisions of the Constitution relating to war powers provide, with re-

War Powers Resolution include the requirement that the President consult with Congress "in every possible instance" before introducing United States Armed Forces into hostilities [4] and, in any event, that the President submit a written report [5] to the Speaker of the House of Representatives and the President *pro tempore* of the Senate within forty-eight hours of introducing "United States Armed Forces ... into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances." [6] Although the War Powers Resolution provides for two other circumstances in which presidential reports must be filed,[7] it is only when a report is filed to reflect the introduction of troops "into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances" that the Resolution's automatic

withdrawal requirement is activated.[8] Under this withdrawal provision, the President must terminate the use of United States Armed Forces sixty days after a report is filed, or is required to be filed,[9] unless Congress declares war, enacts a specific authorization, extends the sixty-day period or is unable to meet due to an armed attack.[10] As drafted, the War Powers Resolution enabled Congress to require the President to withdraw United States Armed Forces prior to the expiration of sixty days by enacting a concurrent resolution to that effect.[11] In the aftermath of the Supreme Court's decision in *Immigration and Naturalization Service v. Chadha,* 462 U.S. 919, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983), however, it is conceded that this provision does not have the force and effect of law.[12]

---

spect to the President, that under article II, sec. 1, cl. 1, "the executive Power that shall be vested in a President of the United States of America;" under article II, sec. 2, cl. 1, that [t]he President shall be Commander in Chief of the Army and Navy; under Art. II, sec. 3, that the President shall "receive Ambassadors and other public Ministers;" and also under article II, sec. 3, that the President must "take Care that the Laws be faithfully executed...." The provisions of the Constitution pertaining to the war powers of Congress provide, under article I, sec. 8, cl. 11, that Congress has the authority "[t]o declare War;" and under article I, sec. 8, cl. 18, that Congress has the power to make laws "necessary and proper for carrying into Execution" its enumerated powers.

The parties did not present or brief the constitutionality of the War Powers Resolution to this Court.

**4.** 50 U.S.C. sec. 1542 (1982).

**5.** 50 U.S.C. sec. 1543(a). The President's written report must set forth: "(A) the circumstances necessitating the introduction of United States Armed Forces; (B) the constitutional and legislative authority under which such introduction took place; and (C) the estimated scope and duration of the hostilities or involvement." *Id.*

**6.** 50 U.S.C. sec. 1543(a)(1). This is the provision that is directly applicable in this case. The War Powers Resolution does not define the term "hostilities" or the phrase "situations where imminent involvement in hostilities is clearly indicated by the circumstances." The meaning of these standards is a central issue in this case.

**7.** These situations are when United States Armed Forces are introduced "into the territory, airspace or waters of a foreign nation, while

equipped for combat, except for deployments which relate solely to supply, replacement, repair, or training of such forces; and [when U.S. Armed Forces are introduced] in numbers which substantially enlarge United States Armed Forces equipped for combat already located in a foreign nation." 50 U.S.C. sec. 1543(a)(2) and (a)(3).

**8.** *See* 50 U.S.C. sec. 1543(a)(1); 50 U.S.C. sec. 1544(b).

**9.** The House of Representatives added the language "or is required to be [filed]" to account for the situation where "the President for whatever reason may decide not to submit a report." H.R.Rep. No. 93–287, 93rd Cong., 1st Sess., at 10 (1973), *reprinted in* 1973 U.S.Code Cong. & Ad. News 2346, 2354.

**10.** 50 U.S.C. sec. 1544(b). The War Powers Resolution also provides for expedited procedures by which Congress can consider legislation introduced during the sixty day period. 50 U.S.C. sec. 1545.

**11.** 50 U.S.C. sec. 1544(c).

**12.** *See* Plaintiffs' Memorandum in Support of Motion for Summary Judgment at 4. The Court notes that a concurrent resolution is enacted without presentment to the Executive. *See* Sutherland, Statutory Construction 499 (Sands 4th ed. 1985). In *Chadha,* the Court invalidated as unconstitutional a one-house legislative veto because it was not presented to the President under the Presentment Clauses of the Constitution. 462 U.S. 919, 951–59 (1983). However, The War Powers Resolution has a separability clause. 50 U.S.C. sec. 1548.

## II. FACTS

The current case concerns the application of the War Powers Resolution to recent activities of United States Armed Forces in the Persian Gulf. The Persian Gulf, a body of water partly bounded by Iran and Iraq, has become the site of numerous military incidents in the ongoing war between these two belligerents.[13] In response to an increase in attacks on commercial shipping during 1986,[14] Kuwait requested the United States to provide protection for Kuwaiti petroleum tankers passing through the Persian Gulf.[15] The United States responded affirmatively on March 7, 1987,[16] and the first reflagged tankers, escorted by United States Navy warships, entered the Persian Gulf by way of the Strait of Hormuz on July 22, 1987.[17] Two days later a reflagged tanker, the S.S. Bridgeton, was seriously damaged when it struck a mine.[18] On September 21, 1987, United States naval forces fired at an Iranian Navy ship that was laying mines in the Persian Gulf.[19]

The executive and legislative branches gave prompt consideration to the applicability of the War Powers Resolution to these events. In the first of several official communications to Congress on the Persian Gulf situation, the President described the September 21, 1987 incident and stated his belief that the War Powers Resolution was unconstitutional.[20] Moreover, the Administration has stated that the War Powers Resolution does not apply to the escort operation in the Persian Gulf.[21] Legislative debate on this topic is reflected in the introduction of several bills to invoke the War Powers Resolution with regard to the situation in the Persian Gulf.[22] Recently, the Senate rejected Senator Brock Adams' bill to authorize the escort operations under the War Powers Resolution but moved to set new rules for handling future war powers disputes.[23] Congress also debated

---

13. Iran and Iraq have been in a state of war since September 1980. *See* Declaration of Richard L. Armitage at Par. 12. The United States is neutral in this war. C. Weinberger, *A Report to the Congress on security arrangements in the Persian Gulf 2* (June 15, 1987).

14. *See* Statement by Richard W. Murphy before the Senate Foreign Relations Committee, *reprinted in* Current Policy No. 963, Department of State. (May 29, 1987).

15. Weinberger, *supra* note 13, at 13–14.

16. *Id.* at 14.

17. Declaration of Michael H. Armacost at Par. 19.

18. *Id.*

19. *Id.* at Par. 20.

20. *Communication From The President of the United States Transmitting A Report On The September 21, 1987 Engagement of United States Armed Forces and Iranian Minelaying Craft In the Persian Gulf*, H. Doc. No. 110–112, 100th Cong., 1st Sess. 1–2 (1987).

The other presidential communications, submitted in October 1987, did not reiterate the President's views on the constitutionality of the Resolution but were filed "consistent with the War Powers Resolution." *See Communication from the President of the United States Transmitting A Report On The October 8, 1987 Engagement Between United States Armed Forces and Iranian Naval Vessels In the Persian Gulf*, H.

Doc. No. 110–113, 100th Cong., 1st Sess. 2 (1987). *See also Communication From The President of the United States Transmitting A Report On The October 19, 1987 Actions By U.S. Armed Forces In the Persian Gulf*, H.Doc. No. 100–120, 100th Cong., 1st Sess. 1 (1987).

Representative Howard Berman argues in his brief *amicus curiae* that these presidential communications satisfy the section 4(a)(1) reporting requirement and that the automatic sixty-day withdrawal provision therefore has been triggered. Defendant opposes Representative Berman's claim on the grounds that it is non-justiciable. Defendant's Response to Brief Amicus Curiae of Representative Howard Berman. Plaintiff opposes Representative Berman's argument on the grounds that the presidential communications do not comply with the requirements for a War Powers Resolution report because they discuss neither the circumstances necessitating United States intervention nor the estimated scope and duration of the intervention. *See* Plaintiffs' Memorandum In Reply to Brief of Amicus Curiae Representative Howard Berman at 1–2.

21. Weinberger, *supra* note 13, at 21.

22. *See e.g.* H.J.Res. 310, 100th Cong., 1st Sess. (1987); S. 1343, 100th Cong. 1st Sess. (1987); H.J.Res. 295, 100th Cong. 1st Sess. (1987).

23. *See* Washington Post, Dec. 5, 1987, at A6, col. 1. For a discussion of earlier activity in the Senate, see Washington Post, Oct. 22, 1987, at A1, col. 4.

the question of whether the War Powers Resolution should be amended or even repealed.[24] Last summer, 110 Members of the House of Representatives and 3 Senators[25] filed the initial complaint in this action. An amended complaint was filed on September 29, 1987. In the amended complaint, plaintiffs dropped their claims against the Secretary of Defense and the Secretary of Transportation regarding the legality of the reflagging operation and retained only their claim against the President under the War Powers Resolution.

## III. ANALYSIS

Plaintiffs' Motion for Summary Judgment and defendant's Motion to Dismiss are now before the Court. Plaintiffs seek to enforce the War Powers Resolution and, in their Motion, argue that that summary judgment is appropriate because the facts in this case are drawn entirely from official government sources and therefore cannot be disputed. Plaintiffs contend that they should prevail as a matter of law because these facts indicate the existence of "hostilities" and, therefore, trigger the section 4(a)(1) reporting requirement. Defendant, in contrast, maintains that this case should be dismissed because it does not present a justiciable controversy. Defendant argues that the doctrines of standing, political question and equitable discretion all pre-

clude judicial review. Defendant also maintains that plaintiffs fail to state a claim for which relief may be granted because a private right of action cannot be implied under the War Powers Resolution. The parties do not present the constitutionality of the War Powers Resolution to this Court.

■ This Court declines to exercise jurisdiction over this case in light of prudential considerations associated with the exercise of equity jurisdiction and the constraints of the political question doctrine.[26] If the Court were to decide whether the President is required to submit a report to Congress under section 4(a)(1) of the War Powers Resolution, the Court also would have to decide whether United States Armed Forces in the Persian Gulf either are engaged in "hostilities" or in "situations where imminent involvement in hostilities is clearly indicated by the circumstances." 50 U.S.C. sec. 1543(a). Because the Court concludes that the exercise of federal jurisdiction in these circumstances would be both inappropriate and imprudent, the Court GRANTS defendant's Motion and DISMISSES this case.

### A. Remedial Discretion

Courts in this Circuit have developed a doctrine of remedial discretion[27] under which the separation of powers issues in-

---

24. Senator John Warner proposed the creation of a bipartisan commission to revise the War Powers Resolution. Washington Post, Oct. 6, 1987 at A8, col. 1. Bills to strengthen and repeal the War Powers Resolution also were introduced. *See* H.R. 508, 100th Cong. 1st Sess. (1987) (strengthening War Powers Resolution); H.R. 2520, 100th Cong. 1st Sess. Sec. 2(a) (1987) (repealing War Powers Resolution); H.R. 2525, 100th Cong., 1st Sess. (1987) (repealing War Powers Resolution).

Finally, the Byrd–Warner Amendment, which did not directly refer to the War Powers Resolution, provided alternate procedures for congressional action regarding the Persian Gulf. Am. No. 952 to Am. No. 951 to S.J.Res. 194, 100th Cong., 1st Sess. 133 Cong.Rec. S14018 (daily ed. Oct. 9, 1987). The Byrd–Warner Amendment provided for automatic congressional approval of the President's actions in the Persian Gulf absent congressional passage of a joint resolution to the contrary within thirty days of the President's submission of a report. *Id.*

25. The three Senators have withdrawn from the lawsuit. *See supra,* note 1.

26. The Court's reliance on the equitable discretion and political question doctrines does not mean that this Court concludes that plaintiffs have standing. The Court does not decide the question of standing. *See Schlesinger v. Reservists to Stop the War,* 418 U.S. 208, 215 & n. 5, 94 S.Ct. 2925, 2929 & n. 5, 41 L.Ed.2d 706 (1974) (stating that standing need not necessarily be analyzed first if the justiciability of a case is challenged on other grounds).

27. The phrase "remedial discretion" has been used to describe the Court's discretion when both declaratory and injunctive relief are requested. *Vander Jagt v. O'Neill,* 699 F.2d 1166, 1175 & n. 25 (D.C.Cir.1982), *cert. denied,* 464 U.S. 823, 104 S.Ct. 91, 78 L.Ed.2d 98 (1983). When only equitable relief is requested, however, the doctrine has been described as one of "equitable discretion." *Id.*

herein in all congressional plaintiff cases can be analyzed as part of a Court's threshold evaluation of the propriety of equity jurisdiction.[28] Relevant to the current case because the congressional plaintiffs herein seek declaratory and injunctive relief, this doctrine initially was set forth for this Circuit in *Riegle v. Federal Open Market Committee.*[29] In *Riegle,* a United States Senator alleged that the procedures under the Federal Reserve Act, 12 U.S.C. sec. 221 *et seq.* (1982), pursuant to which reserve bank members were appointed to the Federal Open Market Committee were unconstitutional and therefore a mandatory injunction to prevent reserve bank members from voting on the Committee should issue.[30] Although the Court concluded in *Riegle* that the Senator had standing to sue, it nonetheless dismissed his case for want of equity.[31]

In setting forth the facts of the case, the *Riegle* court noted that legislation which would have accomplished the Senator's objective had been introduced in the House of Representatives the previous year.[32] Although the legislation was not enacted, the Court stated that the plaintiff remained free to persuade his fellow legislators to amend the allegedly offensive statute.[33] In such circumstances, the Court reasoned, injunctive relief would "thwart[ ] Congress's [sic] will by allowing a plaintiff to circumvent the processes of democratic decisionmaking."[34] The *Riegle* Court concluded by stating that equitable discretion counsels judicial restraint with regard to "challenges concerning congressional action or inaction regarding legislation."[35]

Although styled as a dispute between the legislative and executive branches of government, this lawsuit evidences and indeed is a by-product of political disputes within Congress regarding the applicability of the War Powers Resolution to the Persian Gulf situation. Before the filing of this lawsuit, several bills to compel the President to invoke section 4(a)(1) of the War Powers Resolution were introduced in Congress.[36] Bills also were introduced to alternately repeal and to strengthen the War Powers Resolution.[37] When this lawsuit was filed, Senator Brock Adams stated that he had joined as a plaintiff both to advance his substantive position and to resolve a question that Congress seemed unwilling to decide.[38] In light of this history,

---

**28.** The rule underlying this doctrine is that courts "have broad discretion in deciding whether to issue equitable or declaratory relief." *Vander Jagt, supra* note 27, 699 F.2d at 1175 n. 24.

**29.** 656 F.2d 873 (D.C.Cir.), *cert. denied,* 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981).

**30.** *Id.* at 877

**31.** *Id.* at 882. The Court observes that although the remedial discretion doctrine developed out of standing analysis, it is now treated as an independent doctrine. *See, e.g., Conyers v. Reagan,* 578 F.Supp. 324 (D.D.C.1984), *vacated as moot,* 765 F.2d 1124 (D.C.Cir.1985); *Crockett v. Reagan,* 558 F.Supp. 893, 902 (D.D.C.1982), *aff'd,* 720 F.2d 1355 (D.C.Cir.1983), *cert. denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984).

**32.** *Id.* at 876 & n. 4.

**33.** *Id.* at 882.

**34.** *Id.* at 881.

**35.** *Id.* In its subsequent decision in *Vander Jagt v. O'Neill,* the Court of Appeals extended this doctrine to congressional requests for declaratory relief. *Vander Jagt, supra* note 27, 699 F.2d at 1175 n. 25.

Courts in this Circuit have relied on the remedial discretion doctrine in *Moore v. U.S. House of Representatives,* 733 F.2d 946 (D.C.Cir.1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 779, 83 L.Ed.2d 775 (1985); *Conyers v. Reagan, supra,* note 31; *Crockett v. Reagan, supra* note 31.

**36.** *See supra* note 22.

**37.** *See supra* note 24.

**38.** Senator Adams stated that:
[W]e are blocked on every one of these [bills] and we are going into a congressional recess and I am concerned about attacks on our allies, attacks such as occurred at Mecca, attacks on our ships, the difficulties we have. I want the country united.
We could not get it through before the recess, so yesterday along with Senators Simon and Matsunaga [formerly plaintiffs] and over 100 Members of the House, I joined as a plaintiff in a suit to seek judicial relief and enforcement of the requirements of the War Powers Act, saying it was triggered by this reflagging of vessels.
133 Cong.Rec. S11567 (daily ed. Aug. 7, 1987) (statement of Senator Brock Adams).

this Court concludes that plaintiffs' dispute is "primarily with [their] fellow legislators." [39]

This Court declines to accept jurisdiction to render a decision that, regardless of its substance, would impose a consensus on Congress. Congress is free to adopt a variety of positions on the War Powers Resolution, depending on its ability to achieve a political consensus. If the Court were to intervene in this political process, it would be acting "beyond the limits inherent in the [c]onstitutional scheme." [40] Moreover, in view of a sponsor's statements that the determination of "hostilities" under the War Powers Resolution is a question for the executive and legislative branches, [41] federal jurisdiction would be especially inappropriate in this case. [42]

■ Judicial review of the constitutionality of the War Powers Resolution is not, however, precluded by this decision. A true confrontation between the Executive and a unified Congress, as evidenced by its passage of legislation to enforce the Resolution, would pose a question ripe for judicial review. [43] Even if such a lawsuit were brought by congressional plaintiffs, judicial review would not be precluded on equitable grounds because the Court would not be interjecting itself into legislative debate. Indeed, the availability of constitutional review indicates that the apparent absence of

a private right of action is not fatal to this Court's equitable disposition of this case under *Riegle*. [44]

## B. *The Political Question Doctrine*

The profusion of relevant congressional activity also indicates that this case must be dismissed as a prudential matter under the political question doctrine. In a now-classic catalogue of conditions to which the political question doctrine applies, Mr. Justice Brennan stated in *Baker v. Carr* that:

[p]rominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for non-judicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question. [45]

Mr. Justice Brennan also stated, with regard to cases concerning foreign rela-

---

**39.** *Riegle, supra* note 29, 656 F.2d at 881.

**40.** *Id.* (quoting Hon. Carl McGowan, *Congressmen in Court: The New Plaintiffs,* 15 Ga.L.Rev. 241, 251 (1981). This article was important in the development of the equitable discretion doctrine. The Court in *Riegle* relied on it heavily. *See Riegle, supra* note 29, 656 F.2d at 877–81.

**41.** *See, e.g.,* 119 Cong.Rec. 33,551 (1973) (statement of Sen. Javits); 119 Cong.Rec. 33,558 (1973) (statement of Sen. Javits); 119 Cong.Rec. 36,188–89 (1973) (statement of Sen. Javits). Senator Javits was a sponsor of the War Powers Resolution.

**42.** Although the Court does not decide the question of implied private right of action, it observes that effective enforcement of the reporting requirement has been one of the primary problems plaguing the War Powers Resolution. This problem has been exacerbated, if only indirectly, by the invalidation of the concurrent resolution provision under *Chadha.* Although judicial enforcement therefore may become

more attractive, this Court believes that the sponsors of the Resolution did not contemplate a private right of action to enforce section 4(a)(1). *See supra* note 41.

**43.** *Cf. Goldwater v. Carter,* 444 U.S. 996, 1000–1001, 100 S.Ct. 533, 535–36, 62 L.Ed.2d 428 (1979) (Powell, J., concurring) (discussing ripeness in relation to the political question doctrine).

**44.** In *Riegle,* the Court stated that a congressional plaintiff case can be dismissed on equitable grounds only if constitutional review is guaranteed by the availability of a right of action for private plaintiffs. *Riegle, supra* note 29, 656 F.2d at 881. Although this Court does not believe that a private right of action is available under the War Powers Resolution, the Court does find that constitutional review would be otherwise available. This, the Court believes, satisfies the intent of *Riegle.*

**45.** *Baker v. Carr,* 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962).

tions, that these matters often "lie beyond judicial cognizance" due the need for a "single-voiced statement of the Government's views." [46] Mr. Justice Brennan noted, however, that it would be error to presume that all such cases are nonjusticiable absent "a discriminating analysis of the question posed." [47]

Having analyzed the question in this case, the Court concludes that plaintiffs' request for declaratory relief presents a nonjusticiable political question. If the Court were to grant or deny declaratory relief, and decide whether United States Armed Forces stationed in the Persian Gulf are engaged in "hostilities or ... [in] situations where imminent involvement in hostilities is clearly indicated by the circumstances," [48] the Court would risk "the potentiality of embarrassment [that would result]

from multifarious pronouncements by various departments on one question." [49] Indeed, such a declaration necessarily would contradict legislative pronouncements on one side or the other of this issue.[50] Moreover, a declaration of "hostilities" by this Court could impact on statements by the Executive that the United States is neutral in the Iran–Iraq war and, moreover, might create doubts in the international community regarding the resolve of the United States to adhere to this position.[51] Because this Court concludes that the volatile situation in the Persian Gulf demands, in the words of *Baker v. Carr*, a "single-voiced statement of the Government's views," [52] the Court refrains from joining the debate on the question of whether "hostilities" exist in that region.[53]

■ The Court nonetheless notes that, had the constitutionality of the War Pow-

**46.** *Id.* at 211, 82 S.Ct. at 707.

**47.** *Id.*

**48.** 50 U.S.C. sec. 1543(a)(1).

**49.** *Baker v. Carr, supra* note 45, 369 U.S. at 217, 82 S.Ct. at 710.

**50.** *See supra* notes 22–24 and accompanying text. The Court is not persuaded by plaintiffs' suggestion that the drafters of the War Powers Resolution recognized and, indeed, accepted the risk of multifarious pronouncements by different branches of government, including the judiciary, regarding the existence of hostilities. The drafters did not condone a divided government; if anything, they intended the War Powers Resolution to provide a fixed mechanism by which the executive and legislative branches could make decisions on matters related to war. *See* 50 U.S.C. sec. 1541(a). The only risk Congress appears to have addressed in its debates is the risk associated with the military and international consequences of the automatic sixty-day withdrawal provision. *See e.g.,* 119 Cong.Rec. 24,660 (1973) (statement of Rep. Frelinghuysen); 119 Cong.Rec. 36,212 (1973) (statement of Rep. Brown).

**51.** The Court notes that, in an earlier action to enforce the War Powers Resolution with regard to U.S. intervention in El Salvador, Judge Joyce Green of this Court stated that the foreign policy prong of the political question doctrine is not implicated by lawsuits to enforce the War Powers Resolution. *Crockett v. Reagan, supra* note 31, 558 F.Supp. at 898. Judge Green reasoned that the equitable relief granted in such a case would not "dictate foreign policy but rather

[would] enforce existing law concerning the procedures for decision-making." *Id.*

The current case is distinguishable from *Crockett.* First, the situation in the Persian Gulf is both more volatile and more critical to U.S. economic interests than the situation in El Salvador. This volatility compels the Court to conclude that, although a decision on declaratory relief admittedly would not dictate foreign policy, an affirmative order might well have international ramifications that could affect U.S. policy in the Persian Gulf. Second, in the current case, Congress has debated and voted on the subject of this lawsuit, but in *Crockett* "Congress [had] taken absolutely no action." *Crockett, supra* note 31, 558 F.Supp. at 899. Therefore, the risk of multifarious pronouncements on a sensitive matter of foreign policy is significantly higher in this case than in *Crockett.*

**52.** 369 U.S. at 211, 82 S.Ct. at 707. For this same reason, the Court declines to address the arguments of *amicus curiae* Rep. Howard L. Berman.

**53.** Even if this Court were inclined to add its voice to the debate, this case might well present a non-justiciable political question due to the lack of "judicially discoverable and manageable standards." *Baker v. Carr, supra* note 45, 369 U.S. at 217, 82 S.Ct. at 710.

Plaintiffs argue that, although the War Powers Resolution does not define "hostilities or ... situations where imminent involvement in hostilities is clearly indicated by the circumstances", legislative history indicates that Congress intended these terms to be broad and thus to encompass even "relatively minor action[s]." Plaintiffs' Memorandum In Support of Motion

ers Resolution been squarely presented, "these prudential considerations would [not have been relevant.]"[54] Indeed, if Congress had enacted a joint resolution stating that "hostilities" existed in the Persian Gulf for purposes of section 4(a)(1) of the War Powers Resolution, but if the President still refused to file a section 4(a) report, this Court would have been presented with an issue ripe for judicial review.[55] The Court's task then would have been to analyze the constitutional division of powers rather than to evaluate the seriousness of military activities. The former is within the purview of the judiciary.[56]

## IV. CONCLUSION

This Court will not take jurisdiction of this suit to enforce the War Powers Resolution because of the constraints of the equitable discretion and political question doctrines. The constitutionality of the War Powers Resolution is not before the Court. Although adjudication of constitutional questions should not be encouraged, the courts nonetheless would have the responsibility of resolving the constitutionality of this provision if it were properly presented.

Therefore, defendant's Motion to Dismiss is GRANTED and this case is DISMISSED.

for Summary Judgment 22 (quoting H.R.Rep. No. 93–287, 93rd Cong., 1st Sess. (1973)). The intent behind these provisions, plaintiff argues, was to involve Congress in the decision-making process at a relatively early stage of United States military involvement abroad. *Id.* at 22–23.

If one were to take this discussion at face value, it might be possible to make a common-sense determination regarding the existence of hostilities. However, two considerations compel the Court to question this approach. First, and most importantly, the very absence of a definitional section in the Resolution, coupled with debate suggesting that determinations of "hostilities" were intended to be political decisions made by the President and Congress, suggest to this Court that fixed legal standards were deliberately omitted from this statutory scheme. Second, the factual evaluation of "hostilities [and] ... situations where imminent involvement in hostilities is clearly indicated by the circumstances" is always hampered, to some degree, by a Court's lack of access to intelligence information and other pertinent expertise. This is exacerbated by the ever-changing intensity of "hostilities," especially when they are in their early stages. The President must have flexibility in executing military and foreign policy on a day to day basis. Thus, this Court is inclined to conclude that this case does not present judicially manageable standards.

**54.** *Goldwater v. Carter, supra* note 43, 444 U.S. at 1000–1001, 100 S.Ct. at 535–36.

**55.** *Id.*

**56.** *See, e.g., Nixon v. Fitzgerald,* 457 U.S. 731, 753–54, 102 S.Ct. 2690, 2703, 73 L.Ed.2d 349 (1982); *Buckley v. Valeo,* 424 U.S. 1, 123, 96 S.Ct. 612, 684, 46 L.Ed.2d 659 (1976); *United States v. Nixon,* 418 U.S. 683, 703, 94 S.Ct. 3090, 3105, 41 L.Ed.2d 1039 (1974).