**Michael Ray ANGE, Plaintiff,**

v.

**George BUSH, et al., Defendants.**

**Civ. A. No. 90–2792 (RCL).**

United States District Court,
District of Columbia.

Dec. 13, 1990.

Beth Stephens, Jose Morin, Michael Ratner, Jules Lobel, Peter Weiss, Mahlon Perkins, David Cole, James Klimaski, New York City, for plaintiff.

Stuart M. Gerson, Asst. Atty. Gen., Jay B. Stephens, U.S. Atty., Leslie H. Southwick, David J. Anderson, Vincent M. Garvey, John R. Tyler, U.S. Dept. of Justice, Civ. Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION

LAMBERTH, District Judge.

This case comes before the court on plaintiff's motion for a preliminary injunction, defendants' motion to dismiss, and the parties' cross-motions for summary judgment. Plaintiff, Sergeant Michael Ray Ange, claims that the President's order deploying him to the Persian Gulf exceeds the President's authority under the Constitution's War Powers Clause, U.S. Const. art. I, § 8, cl. 11, and under the War Powers Resolution. 50 U.S.C. § 1541, *et seq.*, (1973). Ange also claims a Fifth Amendment due process violation in the procedure the Army used to determine and review his medical suitability for deployment in the Persian Gulf. Upon consideration of the filings submitted by both parties and by *amicus curiae*, the entire record in this case, and the arguments of counsel at the December 10, 1990, hearing on this matter, the court will dismiss those parts of this case challenging the President's deployment order as presenting non-justiciable political questions, which are, in any event not ripe for judicial review. The court will grant summary judgment for defendants on plaintiff's Fifth Amendment due process claim.

### I. *Relevant Facts.*

On August 2, 1990, Iraqi military forces invaded Kuwait. Plaintiff's Memorandum In Support Of Plaintiff's Motion For Summary Judgment, In Opposition To Defendants' Motion To Dismiss Or For Summary Judgment, And In Reply To Plaintiff's Motion For Preliminary Injunction at Exhibits 2 and 3 ("Plaintiff's Supporting Memorandum"). In response to the Iraqi invasion, President Bush imposed an economic embargo against Iraq and sent U.S. military forces to Saudi Arabia. *Id.* at Exhibits 2 & 3. Shortly after the invasion, President Bush condemned Iraq's aggression and demanded Iraq's withdrawal from Kuwait. *Id.* at Exhibit 3. On August 6, 1990, Iraq's troops began to round up American citizens to be used as human shields. The U.S. military force in the Gulf includes some National Guard and reserve units called up to active duty. Sgt. Ange is a member of one of the National Guard units deployed in the Gulf. Military forces from other nations have since joined the U.S. forces in the Gulf.

On August 9, 1990, and again on November 16, 1990, President Bush sent a letter to the Speaker of the House and the President Pro Tempore of the Senate regarding the deployment of U.S. armed forces in Saudi Arabia and the Persian Gulf region. By August 11, 1990, the United States had imposed a military blockade on Iraq, which included using force to intercept, stop, divert, and board ships in order to enforce the ban on Iraqi imports and exports and bar all items except medical supplies. *Id.* at Exhibit 11. As of November 15, 1990, the U.S. Defense Department had reported 3,680 intercepts by the allied forces, including 420 boardings and sixteen ship diversions; 286 of the boardings were conducted by U.S. forces. *Id.* at Exhibit 7.

Iraq responded to the U.S. military actions by declaring that it considered itself to be engaged in a "holy war" with the United States. *Id.* at Exhibit 10 & 11. The Defense Department reported that Iraq had 430,000 troops in and around Kuwait. *Id.* at Exhibit 7. On October 29, Secretary of State James Baker warned that the United States would not shrink from using force if Iraq continued to occupy Kuwait. *Id.* at Exhibit 15. On November 8, 1990, President Bush announced a significant increase in the number of U.S. troops in the Gulf and stated that his goal was to provide "an adequate offensive military option should that be necessary to achieve our common goals" which he described as "the immediate, complete and unconditional withdrawal of Iraqi forces from Kuwait." *Id.* at Exhibit 14. Defense Secretary Richard Cheney stated that "the additional military capability that's now being added clearly will give the ability to conduct offensive military operations...." *Id.* at Exhibit 16.

On October 1 and 2, 1990, the House and Senate each passed separate and differing resolutions regarding the President's actions. While the House resolution was

called "joint" and the Senate resolution "concurrent," the two were never reconciled and exhibit differences. *Id.* at Exhibits 21 & 22. President Bush and Secretary of State Baker have suggested that the Executive Branch and Congress differ as to what they view as the President's constitutional obligation in exercising the war powers. *Id.* at Exhibits 18 & 25. On November 19, 1990, the United Nations Security Council passed Resolution 678 sanctioning the use of "all necessary means" to force Iraq out of Kuwait unless Iraq withdraws its troops from Kuwait by January 15, 1991.

## II. *Plaintiff's War Powers Challenges Are Political Questions Over Which This Court Declines to Exercise Jurisdiction.*

Ange's lawsuit challenging the President's authority implicates the War Powers Resolution and various provisions of the Constitution. The War Powers Resolution, passed over President Nixon's veto in 1973, requires the President to report in writing to specified members of the House of Representatives and the Senate when, absent a declaration of war, the President introduces armed forces "into hostilities or into situations where imminent involvement in hostilities is clearly indicated by the circumstances." 50 U.S.C. § 1543(a)(1). The War Powers Resolution provides that any use of U.S. armed forces must be terminated within sixty days after a report is submitted or is required to be submitted, unless Congress has declared war, enacted specific authorization for such use of the armed forces, extended by law the sixty day period, or is physically unable to meet as a result of an armed attack. 50 U.S.C. § 1544(b).

The various constitutional provisions cited by both parties to support their positions regarding the respective war powers of the executive and legislative branches, are set forth below. To support his position that the President's deployment orders are unconstitutional, Ange cites the provisions of the Constitution which state that "Congress shall have the power ... to declare war ..." and that Congress has the power to make such other laws as "shall be necessary and proper for carrying into Execution its enumerated powers." U.S. Const. art. I, § 8, cls. 11 & 18. The President, on the other hand, cites different provisions of the Constitution to establish the constitutionality of the deployment orders and the continued deployment of U.S. forces in the Persian Gulf: "the executive powers shall be vested in a President of the United States of America," and the "President shall be Commander in Chief of the Army and Navy...." U.S. Const. art. II, § 2, cl. 1. The President also cites the provision requiring the President to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3.

Ange's challenge to the President's deployment order is threefold. Ange claims first that the deployment to date violates the Constitution's War Powers Clause; second, that Ange faces a realistic threat that the President may initiate an offensive war against Iraq in further violation of the War Powers Clause; and third, that the President's deployment order violates the War Powers Resolution. Ange asks the court to issue an injunction requiring that he be returned to the United States on the grounds that his deployment violates the War Powers Clause of the Constitution and the War Powers Resolution.[1]

---

1. The court finds that Ange has standing to bring the present claim alleging violation of the War Powers Resolution. The War Powers Resolution permits a private cause of action under *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975) The *Ash* test for a private cause of action has three parts relevant here: (1) the plaintiff must be one of the class for whose *especial* benefit the statute was enacted; (2) there must be an explicit or implicit indication of legislative intent to create or deny a private remedy; and (3) it must be consistent

with the underlying purposes of the legislative scheme to create a private remedy for the plaintiff. *Id.* at 78, 95 S.Ct. at 2087–88 (citations and quotation marks omitted).

As to the first requirement, Ange clearly is one for whose benefit the War Powers Resolution was enacted. Enacted near the close of the Vietnam War where 50,000 American soldiers died, Congress ultimately sought to protect U.S. soldiers from loss of life or limb as the result of being committed to fight wars which Congress perceived to be illegal. A private right of action

While Ange takes pains to draft three different challenges to the President's deployment of U.S. military forces in the Persian Gulf, all three claims share one common denominator: the Constitution's allocation of war powers among the executive and legislative branches. If the court were to determine whether the President's deployment to date violates the War Powers Clause, or whether Ange might be ordered into an allegedly unconstitutional "offensive" war, or whether the President's deployment order violates the War Powers Resolution, the court would have to determine precisely what allocation of war power the text of the Constitution makes to the executive and legislative branches.

In Ange's own words, the War Powers Resolution "embodies Congress' search for a legal mechanism to enforce the congressional war-making power." Plaintiff's Supporting Memorandum at 21. The scope of the respective war powers of the executive and legislative branches is implicated by application of the War Powers Resolution in the present case. In order to determine whether the President has violated the War Powers Resolution, this court would necessarily have to determine whether the President, under the Constitution, was or is constitutionally required to comply with the provisions of the War Powers Resolution.

The determination sought by Ange in each of his three challenges to the President's actions in the Persian Gulf is one which the judicial branch cannot make pursuant to the separation of powers principles embodied in the court's equitable discretion and in the political question doctrine. The conditions triggering unreviewability under the political question doctrine were spelled out by the Supreme Court:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for non-judicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). Most, if not all, of the conditions voiced in *Baker v. Carr* exist in the present case.

Primary among the conditions is the "textually demonstrable constitutional commitment" of the war powers to both political branches and the "respect due" the political branches in allowing them to resolve this long-standing dispute over the war powers by exercising their constitutionally conferred powers. In *Harisiades v. Shaughnessy*, 342 U.S. 580, 589, 72 S.Ct. 512, 519, 96 L.Ed. 586, *reh'g denied*, 343 U.S. 936, 72 S.Ct. 768, 96 L.Ed. 1344 (1952), the Supreme Court stated that "policies in regard to the conduct of foreign relations [and] the war power.... are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." Resolution of the present conflict in the Gulf, and the proper role of the legislative and executive branches in that resolution, brings the foreign relations and war powers of both political branches into play.

While the Constitution appears to grant the executive and legislative branches certain powers which either directly or indirectly affect the conduct of foreign affairs, the scope of power wielded by either

can be implied in those soldiers subject to loss of life or limb as the result of being ordered to fight alleged illegal wars. Finally, it would be consistent with the purposes of the legislative scheme to create a private right of action in those whom the legislation ultimately sought to protect. Ange, being a soldier deployed in the Gulf, where he already is in a situation arguably illegal under the War Powers Resolution and subject to being ordered, at great personal risk, into a war which Congress may find illegal under the War Powers Resolution, has standing to seek enforcement of that legislation.

branch is not clearly spelled out in the text of the Constitution.[2] The numerous lawsuits in this circuit which have questioned the allocation of war powers as between the two political branches supports the conclusion that the allocation provided by the framers of the Constitution in the text of that document is far from clear. *See e.g., Mitchell v. Laird*, 488 F.2d 611 (D.C.Cir. 1973) (U.S. military involvement in Indochina); *Dellums v. Bush*, No. 90–2866 (D.D.C. filed Nov. 20, 1990) (Saudi Arabia/Persian Gulf deployment); *Lowry v. Reagan*, 676 F.Supp. 333 (D.D.C.1987) (U.S. reflagging and military escort operation in Persian Gulf); *Crockett v. Reagan*, 558 F.Supp. 893 (D.D.C.1982), *aff'd*, 720 F.2d 1355 (D.C.Cir. 1983), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984) (U.S. military aid to El Salvador).[3]

The judicial branch, on the other hand, is neither equipped nor empowered to intrude into the realm of foreign affairs where the Constitution grants operational powers only to the two political branches and where decisions are made based on political and policy considerations. The far-reaching ramifications of those decisions should fall upon the shoulders of those elected by the people to make those decisions. Certainly, "nothing in the structure of our Government or the text of our Constitution would warrant judicial review by standards which would require [the judicial branch] to equate [its] political judgment with that of Congress," *Harisiades v. Shaughnessy*, 342 U.S. at 590, 72 S.Ct. at 519, or of the President. As the Supreme Court stated:

> even if courts could require full disclosure, the very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the Judiciary has neither the aptitude, facilities nor responsibility and which has long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

*Chicago & Southern Air Lines v. Waterman Corp.*, 333 U.S. 103, 111, 68 S.Ct. 431, 436, 92 L.Ed. 568 (1948) *citing Coleman v. Miller*, 307 U.S. 433, 454, 59 S.Ct. 972, 982, 83 L.Ed. 1385 (1939); *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 319–21, 57 S.Ct. 216, 220–21, 81 L.Ed. 255 (1936).

This court's decision not to exercise jurisdiction in the present case results from an adaptation of the separation of powers principles in the political question doctrine and the equitable discretion considerations evidenced by courts in this jurisdiction. *Riegle v. Federal Open Market Committee*, 656 F.2d 873 (D.C.Cir.1981), *cert. denied*, 454 U.S. 1082, 102 S.Ct. 636, 70 L.Ed.2d 616 (1981); *Lowry v. Reagan*, 676 F.Supp. 333. In *Riegle*, the Court of Appeals for this Circuit stated that the "political question doctrine justifies a finding of non-justiciability primarily when there is an explicit textual commitment of the controversy to a non-judicial branch of government for resolution." *Riegle v. Federal Open Market Committee*, 656 F.2d at 880.

---

**2.** A new textbook indicates that few writers who deal with the control of foreign affairs under the Constitution can resist quoting Professor Edward S. Corwin, one of the leading scholars on presidential power, who said: "the Constitution, considered only for its affirmative grants of power capable of affecting the issue, is an invitation to struggle for the privilege of directing American foreign policy." J. Moore, F. Tipson & R. Turner, National Security Law (1990). A simple reading of the constitutional text is not all that the court must do, however, in order to resolve the present dispute.

**3.** The various allocations of power to the political branches in the text of the Constitution also suggest that the ambiguity as to the war powers was intentional. By exercising those powers clearly within their respective realms, the executive and legislative branches work out their roles by balancing and counter-balancing each other. Through this exercise, the political branches share the war power.

In the present case, there is an explicit textual commitment of the war powers not to *one* of the political branches, but to *both.* The various provisions of the Constitution do not grant the war power exclusively to either the legislative or the executive branch. The powers granted to both branches, however, enable those branches to resolve the dispute themselves. Meddling by the judicial branch in determining the allocation of constitutional powers where the text of the Constitution appears ambiguous as to the allocation of those powers "extends judicial power beyond the limits inherent in the constitutional scheme for dividing federal power." *Id.* at 881 (citations and internal quotation marks omitted). "[R]endering a decision on the merits in this case would pose a greater threat to the constitutional system than would the principled exercise of judicial restraint." *Id.* at 882.[4]

■ By asking the court to determine the constitutionality of the President's actions, Ange asks the court to delve into and evaluate those areas where the court lacks the expertise, resources, and authority to explore. Ange asks the court to find that the President's deployment of U.S. forces in the Persian Gulf constitutes "war," "imminent hostilities," or even the prelude to offensive war. Time and again courts have refused to exercise jurisdiction in such cases and undertake such determinations because courts are ill-equipped to do so. *Mitchell v. Laird*, 488 F.2d 611, 616 (D.C. Cir.1973); *Da Costa v. Laird*, 448 F.2d 1368 (2d Cir.1971), *cert. denied*, 405 U.S. 979, 92 S.Ct. 1193, 31 L.Ed.2d 255 (1972); *Lowry v. Reagan*, 676 F.Supp. 333, 339–41

(D.D.C.1987); *Sanchez–Espinoza v. Reagan*, 568 F.Supp. 596 (D.D.C.1983), *aff'd*, 770 F.2d 202 (D.C.Cir.1985); *Crockett v. Reagan*, 558 F.Supp. at 898; *Atlee v. Laird*, 347 F.Supp. 689 (E.D.Pa.1972) (three judge court), *aff'd*, 411 U.S. 911, 93 S.Ct. 1545, 36 L.Ed.2d 304 (1973).

This court's refusal to exercise jurisdiction under the separation of powers principles of equitable discretion and in the political question doctrine by no means permits the President to interpret the executive's powers as he sees fit, nor does it mean that the legislative branch is helpless without the assistance of the judicial branch. Congress possesses ample powers under the Constitution to prevent Presidential overreaching, should Congress choose to exercise them. If Congress considers the President's current deployment of forces in the Persian Gulf to violate the Constitution, or if Congress considers the country on the verge of being unconstitutionally brought to war, or if Congress concludes at any time that the President's actions in the Gulf have usurped Congress' constitutional role, Congress has many options to check the President. Congress can itself declare war, exercise its appropriations power to prevent further offensive and/or defensive military action in the Persian Gulf, or even impeach the President.

The court does not suggest that any of the above options are appropriate or necessary. Nor does the court suggest that any of them would be politically popular for legislators. The court does believe that the Constitution leaves resolution of the war powers dispute to the political branches, not the judicial branch. Resolution of the

---

4. Moreover, resolution of the current dispute would require the court not only to undertake a textual analysis of the ambiguous constitutional text, but also a structural analysis of the political branches' respective roles. As stated by one noted Constitutional scholar:

> [The constitutional] text is by no means all that counts. There is history, and that history was shaped by what in constitutional law is called structural reasoning. Reasons drawn from structure are as much a part of the Constitution as is the text, as Chief Justice John Marshall demonstrated long ago in *McCulloch v. Maryland.* The respective roles of Congress and the president developed ac-

cording to their structural capacities and limitations. Congress, consisting of 535 members assisted by huge staffs, is obviously incapable of swift, decisive, and flexible action in the employment of armed force, the conduct of foreign policy, and the control of intelligence operations. The very number of persons involved makes confidentiality difficult, to say the least, and the attribution of responsibility impossible.

Robert H. Bork, *Foreword* to L. Crovitz & J. Rabkin, The Fettered Presidency, Legal Constraints on the Executive Branch at x (1989) (hereinafter "Bork *Foreword* ").

war powers dispute lies in the responsible exercise of existing powers already belonging to the political branches.

Because the court finds that resolution of each of Ange's three claims challenging the President's deployment orders and activities in the Persian Gulf would require the court to impermissibly intrude into the realm of authority which the Constitution confers on the executive and legislative branches, those three claims will be dismissed with prejudice.

III. *In Any Event, Plaintiff's War Powers Challenges Are Not Ripe For Judicial Review.*

Even if this case presented a justiciable political question, it would be dismissed as not ripe for judicial review. Plaintiff asserts his claim is ripe because the President has "threatened to attack [Iraq] shortly, and has insisted that he has the authority to do so without prior consent of Congress." Plaintiff's Supporting Memorandum at 21. Ange further asserts that the threat that the President will not seek Congressional consent is "real" and not "speculative," and that there is a need for this court to act before the President attacks Iraq. Ange cites and quotes *Olympic Federal Sav. & Loan Ass'n v. Director, Office of Thrift Supervision,* 732 F.Supp. 1183, 1187 (D.D.C.), *appeal dismissed and remanded,* 903 F.2d 837 (D.C.Cir.1990), for the proposition that this court should issue an injunction at this time because the President may act *"at any moment* and *with no notice* to either plaintiff or the court."

■ To support his claim of the nonspeculative nature of the President's

threatened attack and his own threatened harm, Ange cites to and attached numerous exhibits to his pleadings. These include: testimony of executive branch officials before a Senate committee, United Nations resolutions, newspaper articles which contain statements of executive branch officials, transcripts of news programs involving Congressmen and/or executive officials, Congressional Record excerpts, executive office press briefings, United States Department of Defense and Department of State press releases, *etc.* From these documents, plaintiff asks the court to conclude that the President intends to and will involve the United States in war without first seeking Congressional approval. The court simply cannot draw the conclusion plaintiff requests. Ange's claimed threat of harm from the President's "threat" of bypassing Congress is simply too speculative. Because the court cannot find the President's "threat" to involve the United States in war without Congressional consent is anything but speculative, the court finds that Ange's War Powers Clause and War Powers Resolution claims are not ripe for judicial review. The court believes that even the President does not and cannot know what events will develop in the Gulf—developments have occurred rapidly even during the short course of this lawsuit—and so the President cannot know at this time whether or not he intends to take the nation to war. The court cannot divine the intentions of the President where the court does not believe that the President can even know for himself whether he plans to go to war at all, much less whether he intends to do so with or without Congressional consent.[5] The alleged threat of

5. Judge Bork has noted, as a general proposition, that "[c]hanges in power relations, the shifting nature of alliances and adversarial postures, and, most certainly, the rapid development of military technologies mean that the [President] must often act in ways that no one can foresee even a day in advance, much less in ages to come." Bork *Foreword* at xii. The same realization, applied specifically to the present volatile crisis in the Persian Gulf, suggests the heightened difficulty in this court's attempting to anticipate what events will occur tomorrow and what response the President will make to those events.

The fact that the President's "threats" to wage an offensive war with Iraq may have been made simply to preserve all available options, and not as a statement of present or future intentions, makes the determination requested by plaintiff even more problematic. The administration's statements could well be designed to effectuate a peaceful resolution of the Gulf conflict. The court is not in a position to step into the political arena and attempt to distinguish rhetoric from reality.

harm is rendered even more speculative given that the court would also have to take into consideration the intentions of Iraqi President Saddam Hussein.

Contributing to this court's conclusion that Ange's claims are not ripe is the fact that all the activities which Ange requests this court consider are integrally involved with this nation's conduct of foreign affairs—a realm into which the judicial branch, and, to a lesser degree, the legislative branch, traditionally defers to the executive branch. In *United States v. Curtiss–Wright Corp.*, the Supreme Court stated that

> the federal power over external affairs in original and essential character [is] different from that over internal affairs, [and] participation in the exercise of power is significantly limited. In this vast external realm, with its important, complicated, delicate and manifold problems, the President alone has the power to speak or listen as a representative of the nation.

*United States v. Curtiss–Wright Corp.*, 299 U.S. at 319, 57 S.Ct. at 220. The Supreme Court referred to the President as the "sole organ of the federal government in the field of international relations," and recognized that the President, due to the executive branch's superior sources of information and its greater capacity for secrecy, "has the better opportunity of knowing the conditions which prevail in foreign countries, and especially is this true in time of war." *Id.* at 320, 57 S.Ct. at 221. The Supreme Court emphasized that the President's foreign affairs power did not arise solely from

> an authority vested in the President by an exertion of legislative power, but with such an authority plus the very delicate, *plenary and exclusive* power of the President as the sole organ of the federal government in the field of international relations—a power which does not recognize as a basis for its exercise an act of Congress, but which ... must be exercised in subordination to the applicable provisions of the Constitution.

*Id.* at 319–20, 57 S.Ct. at 221 (emphasis added). The discretion afforded the President in foreign affairs does not apply to domestic affairs. *See e.g., Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (executive power to seize domestic steel mills cannot be implied from aggregate of President's powers in the Constitution).

In light of the discretion afforded the President in foreign affairs, and for other reasons discussed below, Ange's reliance on the language and reasoning in *Olympic* to establish ripeness is misplaced. In *Olympic,* the plaintiff, Olympic Federal Savings and Loan Association ("Olympic"), sought an injunction to prevent the Director of the Office of Thrift Supervision and Federal Deposit Insurance Corporation from appointing a conservator or receiver who would take operational control of Olympic and possibly even liquidate the thrift for non-compliance with regulatory requirements.

The ground for seeking injunctive relief was that the Director had assumed his position as Director in violation of the Appointments Clause. U.S. Const. art. II, § 2, cl. 2. Olympic did not "ask the court to intervene in the Director's substantive decision whether or not to appoint a receiver or conservator for Olympic. Rather, Olympic challenge[d] the Acting Director's constitutional authority to act as Director and ask[ed] the court to enjoin him from taking a specific and apparently imminent act." *Olympic Federal Sav. & Loan v. Director, Office of Thrift Supervision,* 732 F.Supp. at 1187. Thus, Olympic challenged the legal status of the Director, not the Director's expected substantive decision, and the court granted injunctive relief on the basis that the Director did not have the legal status to lawfully make the decision to appoint a receiver or conservator for Olympic. Olympic's complaint was ripe because the Director could make the substantive decision "*at any moment* and *with no notice* to plaintiff or the court." *Id.*

The ripeness issue in the present case can be distinguished from that in *Olympic* on two grounds. First, Ange does not chal-

lenge the President's legal status as duly elected President of the United States. Rather, Ange challenges a speculative substantive decision: whether to engage the United States in a war without Congress' consent. Second, the potential substantive decision in *Ange* concerns a matter of international, not domestic, concern, where the courts, due to the political and practical necessity discussed above, defer to the President. The court in *Olympic* acknowledged that its power over the substantive decision, had it been asked to address it, would have been "severely restricted" due to controlling law which limited the court's "authority to enjoin acts of a receiver or conservator." *Id.* at 1187. Similarly, controlling law—here the case law which addresses the political question doctrine and separation of powers principles, and which establishes the President's unique role in conducting foreign affairs—severely restricts this court's authority to enjoin a potential substantive decision made by the President concerning international affairs. Thus, plaintiff's reliance on *Olympic* to establish ripeness is misplaced.

IV. *Summary Judgment will be Granted for Defendants on Ange's Fifth Amendment Due Process Claim.*

Summary judgment will be granted for defendants on Ange's claim that his Fifth Amendment due process rights were violated by the means the Army used to determine that he was medically fit to be deployed in the Persian Gulf. Ange alleges that he has been denied a full and fair hearing, under Army regulations, regarding his medical fitness to be deployed. Plaintiff's Memorandum in Support of Motion for a Temporary Restraining Order and Preliminary Injunction at 35. Specifically, Ange claims that the Review Board which made the recommendation that Ange was medically fit to be deployed had made its determination by reviewing only Ange's military medical files. The Review Board had not permitted Ange to obtain or submit for their consideration Ange's civilian medical records. *Id.* at 36. Ange seeks to have the court issue an injunction requiring that Ange be returned from deployment in the

Gulf for a review of his medical fitness for duty which comports with due process. *Id.* at 39.

The facts relevant to Ange's Fifth Amendment due process claim follow. Sgt. Ange's National Guard unit was ordered to active duty in the Persian Gulf on October 11, 1990. When Sgt. Ange reported as ordered, he complained of medical problems with his feet and knees. After his unit arrived at Ft. Lee, Virginia, for processing before deployment overseas, Ange's military medical records were reviewed and he was examined by a physician. Ange was then referred to the Army Hospital Orthopedic Clinic, where he was examined by an orthopedic surgeon who gave Ange the classification: "temporary T–3 physical profile."

Based on this profile, the commanding general of Ft. Lee, Brigadier General Paul Vanderploog, referred Ange to a Military Occupational Specialty/Medical Retention Review Board ("Review Board"), to determine whether his knee problem rendered him non-deployable. On October 24, 1990, Ange appeared before the Review Board and complained of problems with his knee and a peptic ulcer. Without waiting for civilian medical information which Ange stated would substantiate his medical complaints, the Review Board found that Ange's medical condition did not preclude his deployment. On October 26, 1990, Ange appealed the Review Board's decision to the Personnel Strength Management Division on the grounds that he had not been allowed to obtain and submit relevant civilian medical records regarding his fitness for duty.

The Review Board's determination was then forwarded to General Vanderploog as a recommendation for his decision. On November 14, 1990, General Vanderploog withheld his decision, because Ange had not been given the opportunity to present his civilian medical records to the Review Board. General Vanderploog also ordered an additional medical exam, which included tests for a peptic ulcer, and permitted Ange to submit his civilian medical records relevant to his medical condition.

518

After again examining Ange and reviewing all medical information provided by Ange, the examining physicians concluded that a limited physical profile for Ange's knee, ankle, and feet was appropriate. This profile did not disqualify him from deployment. On November 17, 1990, these findings were presented to Colonel Michael R. Devine, Acting Commander, U.S. Army Quartermaster School and Center. Col. Devine reviewed this additional information and approved the Review Board's recommendation that the limited profile did not disqualify Ange from deployment. Ange was deployed to the Persian Gulf on November 19, 1990.

■ While initially Ange may have been denied an adequate hearing, the initial Review Board recommendation was not accepted by the officer who was to make the deployment decision. General Vanderploog refused to accept the Review Board recommendation and, instead, ordered that Ange undergo additional medical tests for his alleged ulcer and that Ange's civilian medical records be reviewed. Only after conducting additional medical tests and reviewing all of Ange's civilian and military records did the Army determine, on November 17, 1990, that Ange was medically fit to be deployed in the Persian Gulf. Rousselot Declaration at ¶ 10, filed November 26, 1990.

Ange's initial due process violation allegations have apparently been resolved and Ange has been accorded a full and fair hearing under the applicable Army regula-

tions. Ange does not allege any additional facts regarding any denial of due process. Affirmation of Beth Stephens ¶ 4, filed November 30, 1990. Given that this court is not empowered to review the standards used by the Army to determine the deployability of soldiers, *Cargill v. Marsh*, 902 F.2d 1006, 1007 (D.C.Cir.1990) (citations omitted), and given that Ange's due process claims have been resolved, summary judgment will be granted for defendants on Ange's Fifth Amendment due process claim.

### Conclusion

■ John Cruden's superb article entitled "The War–Making Process,"[6] describes the passage of the War Powers Resolution by Congress a few days after the so-called "Saturday night massacre" of Watergate. He noted that the statute could not wipe away two centuries of executive-legislative struggle over foreign policy leadership. He also noted that a judicial confrontation "would only exacerbate the existing legislative-executive schism during a time when national unity could be the key to the nation's security."[7] The court agrees. These are indeed difficult times. The court must respect both the President's powers as well as the powers of the nation's elected representatives in Congress. Interjecting the court into this political process will only exacerbate the problems facing this nation. This lawsuit must be dismissed.[8]

6. 69 Mil.L.Rev. 35 (1975).

7. *Id.* at 131.

8. The court recognizes that this case presents a situation where the plaintiff may not be able to obtain relief. Plaintiff may not be able to motivate or force Congress to prevent what plaintiff perceives to be an unconstitutional usurpation of the Congressional war powers. However, "the fact that a constitutional violation might go unredressed does not, in itself, permit the federal courts to entertain the suit." *Melcher v. Federal Open Market Committee*, 836 F.2d 561, 565 (D.C.Cir.1987). The judiciary does not play its proper role under our Constitution where it seeks to resolve "issues that are appropriately left to the legislative arena." *Id.* at 564. Furthermore,

[t]he concern that constitutional claims be vindicated, the Supreme Court has taught, does not sweep so broadly as to remold the historic role of the federal courts in our constitutional system of government. Courts are not at liberty to embark upon a broad, undifferentiated mission of vindicating constitutional rights....

*Id.* The relief sought by plaintiff is extraordinary. He asks this court to order his return to the United States. If he is entitled to this relief on the war powers challenges he has brought, all other military members who brought suit would also be entitled to have the courts order them home. In this court's view, however, the decision as to whether to deploy United States troops is not a judicial function.

Accordingly, by separate order filed this date, defendants' motion to dismiss or for summary judgment will be granted, and plaintiff's cross-motion for summary judgment will be denied. The court having entered final judgment in the case, plaintiff's motion for preliminary injunction will be denied as moot.